310 So.2d 273 (1975)
David Lee CUTCHENS
v.
STATE of Mississippi.
No. 48077.
Supreme Court of Mississippi.
March 17, 1975.
Rehearing Denied April 14, 1975.
*274 Walker & Sullivan, J. Ronald Parrish, Laurel, for appellant.
A.F. Summer, Atty. Gen., by Ben H. Walley, Asst. Atty. Gen., Jackson, for appellee.
SUGG, Justice:
David Lee Cutchens was convicted in the Circuit Court of the Second Judicial District of Jones County for the crime of manslaughter by culpable negligence and sentenced to serve fifteen years in the penitentiary.
Cutchens' first assignment of error is:
The search of appellant's body was not made incident to a lawful arrest or with a warrant nor did appellant freely and intelligently give his consent to the warrantless search of his body in which the blood was seized.
Dewey Lee, a Laurel Police Officer, investigated the automobile accident that occurred about 9:00 p.m. on October 7, 1973 in which Eric Gunn lost his life. Gunn was a passenger in a Chevrolet Camaro which was struck by a green Pontiac driven by Cutchens. Officer Lee began his investigation at the scene of the accident and continued it at the hospital where the injured were taken after the accident. He had not determined who was driving the Pontiac at this time. When he entered the hospital he observed Cutchens, an acquaintance, attempting to light a cigarette in the emergency room of the hospital. He stated that when he approached Cutchens to request him to observe the no smoking sign in the emergency room, Cutchens told him he was driving the Pontiac and asked, "Why did the guy pull out in front of him?" As Cutchens spoke, Lee smelled alcohol on his breath and asked Cutchens how much he had consumed. Cutchens at first denied he had been drinking but then admitted that he had a couple of beers that afternoon. Officer Lee then requested Mrs. Deborah Shows, a medical technologist at the hospital, to draw blood from Cutchens for a blood alcohol test. Mrs. Shows told Officer Lee that, since Cutchens *275 was conscious, she would prefer Cutchens sign the request form before she withdrew a blood sample, and that they should explain the purpose of the test to Cutchens before obtaining his signature. She testified that Cutchens was aware of the purpose for which the blood was being taken when he signed the consent and did not object to her taking a sample of his blood. She further testified that Cutchens had blood on his face, but stated she was not aware of the type or extent of injury he had suffered and that, before taking the blood sample, she did not consult the doctor who saw Cutchens later.
Dr. Jerry Welch was called to examine Cutchens at the hospital after the accident and said Cutchens had a fractured nose and a small laceration over one of his eyebrows. When asked if Cutchens had a concussion the doctor replied: "Anyone who gets a lick hard enough to break his nose is suffering from a mild concussion." The doctor was of the opinion that Cutchens was not rational at the time he examined him and was incapable of intelligently understanding or giving his consent to anything. He stated, on cross examination that those who secured Cutchens' consent for the blood test were in a much better position to determine whether or not he was rational and capable of giving his consent at that time.
Cutchens concedes that a search made incident to a lawful arrest or a search made after consent is reasonable. However, Cutchens contends that the extraction of blood from his body violated his Fourth Amendment rights because the consent executed by him was not, "An intentional relinquishment or abandonment of a known right." Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357 (1938). Cutchens contends that he was not advised of his Fourth Amendment rights and therefore his consent was invalid because it was not an intentional relinquishment or abandonment of a known right.
In Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) the U.S. Supreme Court discussed in detail the waiver of one's rights under the Fourth and Fourteenth Amendments. It distinguished Fifth and Sixth Amendment rights and observed that the standards set forth in Johnson were enunciated in the context of the safeguards of a fair criminal trial. The Court held:
Almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial. (412 U.S. at 237, 93 S.Ct. at 2052, 36 L.Ed.2d at 868.)
The opinion then enumerated situations in which the tests set forth in Johnson had been applied. The Court rejected the contention that the State must affirmatively prove that the subject of the search knew that he had a right to refuse consent, and concluded the opinion as follows:
Our decision today is a narrow one. We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. (412 U.S. at 248-249, 93 S.Ct. at 2059, 36 L.Ed.2d at 875).
The question of voluntariness of a consent to search was the subject of Luton v. State, 287 So.2d 269 (Miss. 1973) where we held that accused's lack of knowledge of his right to refuse a search was not the sole controlling factor to be considered in *276 determining whether the consent was voluntary, but the totality of the circumstances surrounding the consent should be considered. In Luton we stated:
We follow the better rule that by analyzing the totality of circumstances pertaining to an individual's consent, a trier of fact can ascertain whether a particular consent was coerced or voluntary... . Voluntariness does not require proof that the accused had specific knowledge of a right to refuse as the sine qua non of a valid and effective consent to the search. (287 So.2d at 273).
Under the totality of circumstances shown by the record in this case, we conclude that the State was not required to demonstrate that Cutchens knew that he had a right to refuse a blood test.
Cutchens next contends under his first assignment of error that he did not intelligently give his consent for blood to be removed from his body because he was suffering from a concussion, was not conscious and was irrational when the consent was given.
The evidence for the State on this question shows that before Cutchens signed the consent he asked two people why the Camaro pulled out in front of him; he denied he had been drinking until he was confronted with the fact that alcohol could be smelled on his breath and then admitted drinking a couple of beers. Those present when Cutchens signed the consent were of the opinion that Cutchens was conscious and aware of the reason the blood sample was being taken. To the contrary Cutchens said he remembered nothing from the time of the accident until the next morning and the doctor who examined Cutchens in the hospital after the blood sample was taken stated that Cutchens was irrational and incapable of giving intelligent consent when examined by him. However, he was not able to say that Cutchens was not capable of giving consent when he signed the consent form, and admitted that the persons who were present at the time Cutchens signed the consent form were in a better position to know if he was capable of intelligently consenting at that particular time.
In Luton, supra, we held that the State must prove consent to a warrantless search beyond a reasonable doubt and the issue is to be resolved by the trial judge rather than the jury. We hold that the evidence meets the test required by Luton, supra, and the trial judge properly admitted the results of the blood test in evidence.
Cutchens next contends that the result of the test conducted on the blood taken from his body and all testimony in relation thereto was admitted contrary to the express provisions of Mississippi Code Annotated section 63-11-7 (1972) which provides in part as follows:
If any person be unconscious or dead as a result of an accident, or unconscious at the time of arrest or apprehension or when the test is to be administered, or is otherwise in a condition rendering him incapable of refusal, such person shall be subjected to a blood test for the purpose of determining the alcoholic content of his blood... ."
The section then provides that the result of any test shall not be used in evidence against such person in any court or before any regulatory body without the consent of the person so tested, or, if deceased, such person's legal representative. It has no application to the facts in this case since Cutchens was not unconscious and was not in a condition rendering him incapable of refusal.
Cutchens also argues that a sample of his blood was not taken by a person authorized under Mississippi Code Annotated section 63-11-9 (1972). This argument is not well taken because the limitation in 63-11-9 of persons who may take blood samples refers to samples taken under section 63-11-7 and, as heretofore stated, his *277 blood was not withdrawn under the authority of 63-11-7.
Cutchens raises on appeal the argument that the chemical analysis of his blood was not performed by an individual possessing a valid permit issued by the State Board of Health for making such analysis under section 63-11-19 Mississippi Code Annotated (1972) which reads as follows:
A chemical analysis of the person's breath, blood or urine, to be considered valid under the provisions of this section, shall have been performed according to methods approved by the state board of health and the commissioner of public safety and performed by an individual possessing a valid permit issued by the state board of health for making such analysis. The state board of health and the commissioner of public safety are authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the state board of health. The state board of health shall not approve the permit required herein for any law enforcement officer other than a member of the state highway patrol, a sheriff or his deputies, or a city policeman.
The state board of health shall make periodic tests of the methods, machines or devices used in making chemical analysis of a person's breath as shall be necessary to insure the accuracy thereof, and shall issue their certificate to verify the accuracy of the same.
The purpose of this section is three-fold. First, it authorizes a chemical analysis of a person's breath, blood or urine when such test is performed according to methods approved by the State Board of Health and Commissioner of Public Safety by an individual possessing a valid permit issued by the State Board of Health.
Second, it implements the provisions of Mississippi Code Annotated section 63-11-5 (1972).[1] It provides that a permit may not be issued to any law enforcement officer other than a member of the State Highway Patrol, a sheriff or his deputies, or a city policeman.
The third purpose is to provide for the certification and testing of methods, machines or devices used in making the chemical analysis of a person's breath.
The tests authorized by the Implied Consent Law are not exclusive because Mississippi Code Annotated section 63-11-39(2) (1972) provides:
No provisions of this chapter shall be construed as limiting the introduction of any other competent evidence bearing upon the question whether or not the person was under the influence of intoxicating liquor.
This section does not limit the evidence of chemical tests to the chemical tests provided for by the Act, but permits the introduction *278 of "any other competent evidence" bearing on the question of intoxication.
In Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) the Supreme Court of the United States recognized the validity of tests to measure the blood-alcohol level of one charged with crime and applied the test of reasonableness to the procedures used. It stated:
Similarly, we are satisfied that the test chosen to measure petitioner's blood-alcohol level was a reasonable one. Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol. See Breithaupt v. Abram, 352 U.S. [432], at 436, n. 3, 77 S.Ct. [408] at 410, 1 L.Ed.2d 448 [at 451]. Such tests are a commonplace in these days of periodic physical examination and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain. Petitioner is not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as the "breathalyzer" test petitioner refused, see n. 9, supra. We need not decide whether such wishes would have to be respected. (384 U.S. at 771, 86 S.Ct. at 1836, 16 L.Ed.2d at 920).
Since the tests authorized in the Implied Consent Law are not the exclusive tests that may be used to determine the blood-alcohol level in the body of a person, the question then presents itself, was a reasonable test performed on Cutchens?
Mrs. Shows drew the blood from the body of Cutchens at the Jones County Community Hospital. She obtained a bachelor of science degree in medical technology from Mississippi State College for Women and had twelve months extensive training at the Jones County Community Hospital, School of Medical Technology. The test to determine the blood-alcohol percentage was performed by Dr. Arthur Hume. Dr. Hume is a toxicologist employed as Director of the Mississippi State Crime Laboratory and helped establish the Implied Consent program in Mississippi for the chemical testing of the breath for alcohol content. He received bachelor of science and master of science degrees in pharmacy from the University of Mississippi and a PhD degree in pharmacology from the University of Mississippi, Medical Center. In addition, he trained two years in the area of drug analysis and toxicology at Vanderbilt University at Nashville, Tennessee, and possesses wide experience in analyzing samples of blood for alcohol, both in research and in analysis in the crime laboratory. It is unquestioned that Cutchens' blood was withdrawn and the test performed by persons qualified to perform such functions. No question is raised as to the procedures used by Mrs. Shows and Dr. Hume. We therefore hold that the test was reasonable and the results thereof admissible as other competent evidence under section 63-11-39(2).
Cutchens also argues that the trial court erred when the court commented in the presence of the jury, "That is a matter of law" after sustaining his objection to a question directed to Dr. Hume as to the meaning of the results of the blood-alcohol test performed by Dr. Hume. The record shows the following:
Q. All right, sir. And based on your examination and analysis, and your experience and training, what does that .15% alcohol, ethyl alcohol by weight, what does that mean?
BY MR. BILL SULLIVAN:
If the Court please, we object to that.
BY THE COURT:
I sustain the objection to that. That is a matter of law.
BY MR. ODOM:
Q. All right, sir. And do you have an opinion as to the extent of the alcoholic *279 content in the blood there that you analyzed and found, as to the effect that that has on a person?
BY MR. WALKER:
To which we object.
BY MR. BILL SULLIVAN:
We object.
BY THE COURT:
The question is the effect that amount would have on a person?
BY MR. ODOM:
Yes, sir.
BY THE COURT:
I sustain the objection to that.
BY MR. ODOM:
Q. All right. Based on your experience and your training, and your examination and analysis of the blood in the object which you have in your hand, were you able to translate the alcohol that you had in there into whether or not that is sufficient to produce drunkenness?
BY MR. WALKER:
To which I object.
BY THE COURT:
Sustained.
BY MR. ODOM:
That's all.
BY MR. WALKER:
No questions.
BY MR. ODOM:
All right, sir, you may go.
The court sustained the objection, therefore the witness was not allowed to interpret the test results, nor was the State instruction on this point granted. The end result was that the import of the test result was kept from the jury leaving the significance of the amount of alcohol in Cutchens' blood as a matter of surmise and conjecture. Dr. Hume should have been permitted to interpret the result of the test made by him, otherwise his testimony was meaningless on the issue of Cutchens' sobriety or intoxication. Cutchens was successful in keeping from the jury an interpretation of the test and to that extent was benefited rather than prejudiced.
Cutchens argues that the statement of the trial judge was an oral instruction to the jury stating conclusively, as a matter of law, that appellant was intoxicated, was a comment on the weight of the evidence and an invasion of the province of the jury. We are not persuaded this statement of the trial judge amounted to a comment on the weight of the evidence or invaded the province of the jury.
Cutchens also assigns as error Instruction No. 4[2] for the State. He argues that the instruction erroneously defines culpable negligence as gross negligence. Following the words gross negligence in the instruction, a proper definition of culpable negligence is given. Rush v. State, 278 So.2d 456 (Miss. 1973); Parks v. State, *280 267 So.2d 302, cert. denied 411 U.S. 947, 93 S.Ct. 1923, 36 L.Ed.2d 408 (Miss. 1972). The instruction given in this case is different from the one condemned in Grinnell v. State, 230 So.2d 555 (Miss. 1970) where culpable negligence was defined as nothing more than gross negligence.
Cutchens also argues that he should have been permitted to develop, outside the presence of the jury, the voluntariness of his consent to withdraw a sample of his blood. Shortly before the noon recess on the first day of the trial one of the attorneys for Cutchens stated to the court:
[I]f the Court please, we anticipate the District Attorney eliciting something from this witness which would be highly improper and prejudicial and we ask that it be developed outside the hearing of the jury.
Court recessed for lunch and the trial judge instructed the attorneys to return before the jury following the noon recess so that the matter could be taken up at that time. The record shows that the attorneys for the defendant did not return and it was necessary for the court to send for them so that the trial could resume. The court did not take up the matter at that time, but proceeded with the trial. Later during the testimony of the witness Lee, Cutchens' attorney stated:
If the Court please, I anticipate what he is attempting to bring in, and I would like to challenge whether or not it is competent evidence in front of the jury.
The court inquired of counsel if this was the matter that he had been told he could take up earlier out of the presence of the jury and counsel responded that he did not know whether it was or not, whereupon the court declined to excuse the jury.
At the time Dr. Hume was called to testify, Cutchens' attorney stated:
If the Court please, I am going to ask at this point that the jury be excused and this testimony be developed in the absence of the jury.
The court responded that there was no need to develop all of this testimony in the absence of the jury and the trial proceeded.
Cutchens did not deny that he signed the consent to permit a sample of his blood to be drawn, but his defense was that his consent was invalid because he was unconscious or as expressed by his attorney, "he was out on his feet" at the time the consent was signed. He was able to develop fully the circumstances surrounding the consent that Cutchens gave. It has been heretofore noted in this opinion that the question of admissibility and the voluntariness of the consent of Cutchens was a question to be decided by the court and not the jury. It would have been better practice to have examined into the voluntariness of the consent outside of the presence of the jury, but since the evidence was sufficient to sustain the fact that Cutchens' consent was voluntarily given no prejudicial error was committed. If the evidence had shown lack of voluntary consent, a reversible error would have resulted requiring reversal and remand.
Finally, Cutchens argues that the verdict of the jury was contrary to the overwhelming weight of the evidence. The evidence on behalf of the State shows that Cutchens ran a red light, was driving 80 to 115 miles per hour in an area congested with heavy traffic and in an area where the posted speed limit was 40 miles per hour. Cutchens denied that his negligence was the proximate cause of the accident, but claimed that the accident was caused by a sudden brake failure on his automobile. Both he and his witnesses testified that he was driving not over 40 or 50 miles an hour before he entered the intersection where the accident occurred. This evidence created a question of fact for determination by the jury. It does not appear that the verdict is a result of bias, prejudice or fraud or is manifestly against the weight of the credible *281 evidence, but there was sufficient evidence to support the verdict of the jury. Nash v. State, 278 So.2d 779 (Miss. 1973); Campbell v. State, 278 So.2d 420 (Miss. 1973) and McLelland v. State, 204 So.2d 158 (Miss. 1967).
Affirmed.
RODGERS, P.J., and PATTERSON, SMITH and ROBERTSON, JJ., concur.
NOTES
[1] Any person who operates a motor vehicle upon the public highways, public roads and streets of this state shall be deemed to have given his consent, subject to the provisions of this chapter to a chemical test or tests of his breath for the purpose of determining the alcoholic content of his blood if lawfully arrested for any offense arising out of acts alleged to have been committed while the person was driving a motor vehicle on the public highways, public roads and streets of this state while under the influence of intoxicating liquor. The test or tests shall be administered at the direction of any highway patrolman, sheriff or his duly commissioned deputies or any police officer in any incorporated municipality when such officer is the arresting officer and has reasonable grounds and probable cause to believe that the person was driving or having under his actual physical control a motor vehicle upon the public streets or highways of this state while under the influence of intoxicating liquor. No such tests shall be given by any officer or any agency to any person within fifteen minutes after the actual arrest.
[2] The Court instructs the Jury for the State of Mississippi that criminal or culpable negligence in the operation of an automobile sufficient to warrant a conviction of manslaughter is such gross negligence which under the circumstances then and there existing evidences a wanton and reckless and wilful disregard for human life, and the conscious and wanton and reckless disregard of the probabilities of fatal consequences to others as a direct result of the wilful creation of an unreasonable risk thereof; and if you believe from all the evidence in this case beyond a reasonable doubt that at the time and place complained of, the Defendant David Lee Cutchens was then and there guilty of such culpable negligence, and that, as a direct result thereof, the said John Eric Gunn was killed, and if you do believe so from all the evidence in this case beyond a reasonable doubt, then the Defendant David Lee Cutchens is guilty as charged in the indictment and the Jury should so find.