387 So.2d 745 (1980)
Mark J. RAMON
v.
STATE of Mississippi.
No. 52064.
Supreme Court of Mississippi.
September 10, 1980.
*746 George F. Bloss, III, Moreton, Woodfield, Raines & Bloss, Gulfport, for appellant.
Bill Allain, Atty. Gen. by Robert D. Findley, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROBERTSON, P.J., and WALKER and BOWLING, JJ.
BOWLING, Justice, for the Court:
Appellant was indicted, tried and convicted the crime of manslaughter in the Circuit Court of the Second Judicial District of Harrison County and sentenced to serve a term of eleven years with the Mississippi Department of Corrections. On appeal, he assigns seven alleged reversible errors, as follows:
1. The court erred in admitting evidence resulting from an unreasonable search and seizure.
2. The court erred in admitting evidence in violation of the medical privilege.
3. The court erred in admitting certain physical evidence as the chain of custody was not established.
4. The court erred in refusing to grant defendant's peremptory instruction.
5. The court erred in refusing to permit defendant to amend Instruction No. D-10 to submit his defense and theory of the case to the jury.
6. The court erred in refusing to grant Instruction No. D-8 defining "wilful" as it appeared in other instructions.
7. The court erred in permitting the State to question defendant concerning his use of drugs on occasions unconnected with the crime for which he is indicted.
This unfortunate case originated because of the excessive use of drugs and alcohol. We hope that the facts and testimony do not confirm a situation existing as testified to by appellant when, after being asked about his use of drugs and alcohol on the night in question, made the statement that "at a party of this generation, I mean, this goes on every day." This writer does not believe that statement condemning the majority of young people. Unfortunately, however, such activity caused the death of Linda Lea Locke on the night of November 24, 1978.
The indictment resulted from an automobile collision between the vehicle owned by *747 appellant and a palm tree in the median area of U.S. Highway 90 in the City of Biloxi. The car was traveling an easterly direction when the driver lost control and struck the palm tree "head-on," resulting in the complete demolishing of the car and the death of Miss Locke. Eyewitnesses testified that the car was traveling at a very high rate of speed.
Admittedly appellant (24 years of age) and the deceased (18 years of age) had attended a party in an apartment in Biloxi. The testimony was undisputed that appellant was in a highly intoxicated condition while at the party between nine o'clock p.m. and approximately 10:30 p.m. He was in such a condition that he had to be placed on the bed by some of the party-goers. The testimony regarding the extent of intoxication of the deceased was conflicting. The only real issue in the case was whether or not when the vehicle left the party with its two occupants, the deceased or the appellant was driving. The jury found against appellant on this issue and had ample grounds to do so.
ASSIGNMENT OF ERROR NO. 1. Through his attorney, appellant filed a motion to suppress the results of a urine test secured in the emergency room of the hospital about one or one and one-half hours after the collision occurred. This test revealed that appellant had a significant amount of the drug "methaqualone" in his body. Also included in the motion was a request to suppress all medical records of the defendant and all testimony of doctors and medical personnel, all statements made by the appellant, any drugs found in appellant's clothing, and any scientific tests performed in connection with the items secured either from appellant's body or his clothing. There was a pretrial hearing on the motion to suppress.
The testimony in regard to what occurred in the emergency room of the hospital is undisputed except for the implications to be gained from the physical facts and the testimony of appellant, who stated that he remembered nothing from the time he left the party until approximately twenty-four hours later while in the hospital. The State first introduced the testimony of a Biloxi Police Captain with many years experience, and the testimony of a male nurse, one Steven Delahousey. The officer arrived at the scene of the collision shortly thereafter and, as stated, found the car to have struck the palm tree with the former being badly demolished. This officer and another Biloxi Police Officer took photographs and completed their investigation at the scene prior to going to the hospital to complete the investigation and file their report. They arrived at the hospital approximately one to one and one-half hours after the collision occurred and found the appellant to be unclothed on a table in one of the emergency rooms, with his clothing piled near the table in a corner of the room. At that time a Foley catheter already had been placed through the natural opening into appellant's urinary tract.
According to the captain, the officers needed to secure appellant's driver's license in order to complete their investigation and secure proper identity. While looking in the clothing a "pill" was seen and secured by the officers. This was placed in a container for later examination. Without objection, the police captain testified that the pill was later identified as the drug "methaqualone," which had a street name of "qualude." The driver's license was secured. The officer talked with appellant, who advised that he was the only one occupying the vehicle at the time the collision occurred. The officer then testified that from observing appellant he suspected that he had been and was under the influence of some type of intoxicant. He then requested that Nurse Delahousey secure urine and blood samples for examination. The nurse stated that the policy of the hospital was that this could not be done without the consent of the patient. The officer requested that this consent be secured if possible. The nurse then prepared a consent form, placed it on a clipboard, and presented it to appellant at a time when the two officers and another registered nurse, Supervisor Audrey Lestrade, were present. The police captain testified that the securing of appellant's *748 consent was actually done by Nurse Delahousey; that the latter first read the form to appellant and asked him if he would consent to its execution. The officer testified that appellant agreed to execute the consent form but was not able to sign his name because he was in pain. Appellant then took the pen and made an "X" mark where his signature normally would be placed. The nurse then made a notation that the "X" mark was appellant's mark and was made by him personally. The police captain testified that no threats of any kind were made to appellant in securing the consent for the urine and blood samples. He further testified that appellant, prior to the actual consent, was belligerent, argumentative and using profanity, but that in his opinion this did not prevent appellant from understanding what he was doing and that appellant clearly appeared to understand why the consent form was being secured.
The State then presented Nurse Delahousey, who related the request of the police captain to secure the urine and blood samples. The nurse related his action regarding the preparation of the consent form and its presentation to appellant. The nurse recognized that any consent given by appellant under the circumstances necessarily would have to be an informed consent. He stated that he read the consent form to appellant and explained it to him; that no force or coercion whatever was used. He reiterated the officer's testimony that appellant stated he could not sign his name because of pain from injuries sustained in the collision but that he used the pen to make an "X" on the signature line. It was the definite opinion of Nurse Delahousey that appellant comprehended the nature of the request and the matter to which he was consenting.
It is significant to note that prior to the officers reaching the emergency room, the Foley catheter was already in place and urine already had been withdrawn from appellant on the order of the emergency room physician. The testimony, however, does not reveal that this prior secured urine was used for the test that went to the police department or whether additional urine that came from the catheter was used.
Appellant then was placed on the stand and as hereinbefore stated, testified that he remembered nothing from the time he left the party in an intoxicated and drugged condition until some twenty-four hours later. His denial of the consent for the urine and blood samples to be taken was based on this lack of memory.
In rebuttal the State again placed Nurse Delahousey on the stand and he reiterated his explanation of the request for consent that was made to appellant and testified positively that appellant indicated to him that he fully understood what he was doing.
Supervising Nurse Audrey Lestrade testified that she was present during the entire time of securing the consent from appellant and she signed the executed form as a witness. She testified that although appellant was asking for medication for pain and was obviously in pain, it was her opinion that he knew what he was doing when he gave his consent for the test.
The state presented the other Biloxi policeman who was present in the emergency room. He saw appellant take the pen and make his mark on the signature line of the form; that appellant seemed to understand everything that was said. He reiterated the testimony of the other state's witnesses that prior to this particular consent form being executed, the appellant had executed a consent form to the hospital for his hospital treatment.
This police officer's testimony is very significant when he testified that he asked appellant where his driver's license was and appellant told him it was in his clothes. This officer found the driver's license in the pocket of appellant's pants.
Considering the foregoing recitation of the material evidence on appellant's motion to suppress, it is clear that a question of fact was presented to the trial judge for his decision. Under the evidence and the authorities, it is impossible for this Court to say as a matter of law that the lower court *749 was in error in overruling appellant's motion to suppress. In Cutchens v. State, 310 So.2d 273 (Miss. 1975), the facts were similar to those in the case sub judice. As contended by appellant here, Cutchens alleged that the securing of the blood and urine samples was an unreasonable search and seizure at a time when the accused was not under arrest and was in violation of appellant's rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article 3, section 23 of the Mississippi Constitution.
Cutchens, supra, discussed the prior opinion of this Court in the case of Luton v. State, 287 So.2d 269 (Miss. 1973). It was reiterated that the State must prove consent to the warrantless search beyond a reasonable doubt and that the issue is to be resolved by the trial judge rather than the jury. The Cutchens opinion was further based on the United States Supreme Court case of Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). There that Court set out guidelines as to what constitutes a search by consent. Several quotes from Schneckloth are of significance. The Court said:
The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.
.....
In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused.
.....
Similar considerations lead us to agree with the courts of California that the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.
As with police questioning, two competing concerns must be accommodated in determining the meaning of a "voluntary" consent-the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.
In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence ...
The United States Supreme court further stated:
Almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial.
The Court, in Schneckloth, and as quoted by this Court in Cutchens, further stated:
Our decision today is a narrow one. We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent ...
*750 As was indicated in Cutchens, supra, the same constitutional principles apply whether the question deals with a search of personal property or the person, including taking a substance from the body.
We hold that it clearly was a question of fact for the trial judge to decide whether or not under the evidence presented appellant gave his "informed consent" to the securing of urine and blood samples. As can be seen from the testimony of the four persons present, this informed consent was given. Everyone present testified that appellant knew and understood what he was doing. The only dispute was appellant's testimony of nonremembrance.
There was no error in admitting into evidence the pill found in appellant's clothing. In the first place, as before stated, one of the officers testified that upon his request, appellant told him where to find his driver's license. This was implied consent. Secondly, it was well established that the officers needed the license to complete their investigation and for identity purposes. While carrying out this duty, the pill came in plain view. All courts hold that an officer has a right to seize an illegal object that is in plain view when incident to a proper activity being performed by the officer. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).
ASSIGNMENT OF ERROR NO. 2: Appellant, both on the motion to suppress and during the trial in chief, objected to the testimony of Nurses Delahousey and Lestrade, contending that their testimony was privileged communications under Mississippi Code Annotated section 13-1-21 (1972), commonly known as the privileged communication statute. As we heretofore have seen, the two nurses in question were employees of the hospital and were on duty in the emergency room. No physician, according to this record, had anything to do with the securing of the consent from appellant. No physician testified at the hearing in regard to appellant's treatment or condition. On the question of privileged communications heard or received by nurses, this Court clearly laid down rules to be followed in Mississippi Power & Light Co. v. Jordan, 164 Miss. 174, 143 So. 483 (1932). We do not recede from our pronouncement that if a nurse at the time of receiving medical information was an agent of the physician attending the patient and the nurse's presence was in connection with the physician's treatment, that knowledge is privileged and the testimony would be excluded upon objection.
Here, as stated several times, the two nurses in question were supervising nurses of the emergency room and employed by the hospital. The objectionable testimony was not in connection with treatment by a physician and the record does not show that a physician even knew of the procedures being taken. This assignment, therefore, has no merit.
ASSIGNMENT OF ERROR NO. 3: Appellant objected to the introduction of the results of the urine test which showed the drug methaqualone in appellant's system. It is alleged that the continuity chain of the urine getting to the laboratory for its tests and its return was not established sufficiently. The fallacy of this alleged assignment of error is so clear that we see no need to make a detailed discussion except to say that the record is abundantly clear that the chain of custody resulting in the testimony regarding the drug being present in appellant was entirely sufficient.
ASSIGNMENT OF ERROR NO. 4: Appellant mainly argues under this assignment that sufficient evidence was not submitted by the state to prove that appellant and not the deceased was operating the vehicle. It is sufficient to say that there was ample testimony for the jury to so find. The photographs of the physical situation after the collision occurred constituted strong evidence for the jury's consideration on this issue. The eyewitnesses who were at the scene immediately saw appellant crawling from the area where the driver's seat was located after the collision. A witness *751 testified positively that the last time the car was seen before it left the "party" appellant was sitting in the driver's seat. There is no merit to this contention.
ASSIGNMENT OF ERROR NO. 5: Defendant's refused instruction D-10 was to the effect that if the jury believed the collision was caused solely by the blowing of sand across the highway, then the verdict should have been for the accused. After the court's statement that there was no evidence of sand being blown, appellant's attorney requested that the instruction be amended merely to state that if sand was on the highway, the accused, in effect, should be acquitted. In the first place, the testimony of the eyewitnesses clearly showed that the proximate cause of the collision was speed and loss of control of the vehicle from inability to operate it rather than sand. Furthermore, the giving of the amended instruction would have constituted a comment on the evidence by the trial court. There is no merit in this assignment.
ASSIGNMENT OF ERROR NO. 6: Appellant's submitted Instruction D-8 was an attempt to define the word "wilful." A number of instructions were given for both the State and the defendant. The word "wilful" as used in the instructions was a matter for interpretation by the jury. Furthermore, in a prosecution for manslaughter, the charge is the action of "culpable negligence" which is a lesser term than "wilful." All the instructions adequately informed the jury as to its duties under the law as applied to the evidence in the case.
ASSIGNMENT OF ERROR NO. 7: There is no merit to this assignment of error. There was only one objection to any cross-examination of appellant in regard to drugs, about which, as hereinbefore stated, he readily volunteered information regarding their use by the present generation. There was no testimony regarding prior or subsequent use of drugs by appellant. He was examined about his use of drugs on the night in question, which he readily admitted, obviously without any remorse. As stated above, any reference on cross-examination by the State regarding other drug use did not meet with any objection, and, in fact, on being questioned, appellant explained without objection that he had taken similar drugs on a "number of occasions in the past, I would imagine. It goes on every day."
We find no reversible error in this cause. It is hard to see how any reasonable jury could have returned a verdict other than guilty as charged. Undisputedly, this unfortunate death and conviction of appellant arose from what appellant readily described as the widespread use of drugs "by this generation." We hope that he was incorrect in this assessment and would certainly hope that the results of the party on the night in question in Biloxi will serve to deter any of appellant's classified people from meeting the same end. As is generally recognized, criminal laws are mainly to deter other crimes. All this Court can do is to interpret those laws in each individual case and hope that the persons having knowledge of the final decision will learn some lesson as a result.
AFFIRMED.
SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and COFER, JJ., concur.
PATTERSON, C.J., took no part.