881 So.2d 209 (2003)
Patrick JONES, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2000-KA-00407-COA.
Court of Appeals of Mississippi.
May 6, 2003.
*211 Raymond L. Wong, Cleveland, attorney for appellant.
Office of the Attorney General by Dewitt T. Allred III, attorney for appellee.
EN BANC.

ON MOTION FOR REHEARING
IRVING, J., for the Court.
¶ 1. The motion for rehearing is denied. However, the original opinion issued herein is withdrawn and this opinion substituted.
¶ 2. Patrick Jones appeals from a judgment of conviction entered by the Circuit Court of Bolivar County, Mississippi following a jury verdict which found him guilty of negligently causing the death of another while operating a vehicle under the influence of cocaine. In this appeal, Jones contends that the trial court erred in admitting the results of his urine analysis and that the evidence is insufficient to support the verdict. He also contends that the verdict is against the weight of the evidence and exhibits bias and prejudice against him since, in his view, it is based solely upon suspicion and speculation. We disagree and affirm the judgment of the trial court.

FACTS
¶ 3. While driving his loaded tractor trailer rig along Highway 61 North, just south of Shaw, Jones collided with Emma Powell's automobile. More specifically, Jones struck Powell's vehicle from the rear as they were both proceeding north in the outside lane of Highway 61 North which, at the point of impact, is a four-lane highway. At the time of the collision, the weather was clear. There were no obstructions blocking the view of northbound motorists. There were no skid marks indicating that Jones had applied his brakes prior to impact. However, there were skid marks from Powell's vehicle, apparently caused by the weight of Jones truck resting on the rear of her car while, at the same time, pushing her car down the road. Powell and Jones were both injured and transported to the Bolivar Medical Center. Powell later died as a result of the injuries she received.
¶ 4. Sergeant Bob McFadden with the Mississippi Highway Patrol's Traffic Enforcement Division investigated the accident. After Powell was pronounced dead, McFadden administered a breath test to Jones. This test was negative for alcohol, and McFadden did not request that a urine analysis be performed on Jones.
*212 ¶ 5. Although McFadden did not request that a urine analysis be administered to Jones, one was administered by hospital personnel as a part of the diagnostic treatment administered to Jones.[1] Clint Robinson, an emergency room registered nurse, retrieved the urine sample from Jones, and Betty Cooper, a medical technologist with Bolivar Medical Center, following hospital procedures, performed the analysis on Jones's urine. This analysis determined that Jones had cocaine in his system. The results of Cooper's cocaine analysis were confirmed, pursuant to standard hospital policy, by Memphis Pathology Laboratories (MPL). However, no one from MPL testified. Over persistent objection from Jones, the trial court admitted the results of the urine analysis, performed by Cooper, and the confirmation report performed by MPL. Additional facts will be presented during the discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES

1. Admissibility of the Result of Urine Analysis
¶ 6. Jones contends, for several reasons, that it was error for the trial court to admit the result of his urine analysis. First, he contends that the analysis was not performed by methods approved by the State Crime Laboratory and the Commissioner of Public Safety as required by Mississippi Code Annotated § 63-11-19 (Rev.1996). He next argues that Cooper, who performed the analysis, did not possess a valid permit issued by the Mississippi State Crime Laboratory for making such analysis. Thirdly, he contends that the confirmation report from MPL, which confirmed Cooper's findings, was hearsay and violated his right of confrontation under the Sixth Amendment to the United States Constitution. Finally, he contends that the urine sample existed as a result of a physician-patient relationship because it was taken as part of his care as a patient and not at the direction of Sergeant McFadden as directed and authorized by Mississippi Code Annotated § 63-11-19 (Supp.2001). Since he never waived the physician-patient privilege, Jones asserts that any analysis and testimony about the analysis should not have been allowed.
¶ 7. The State contends that the statute in question is superseded by the Mississippi Rules of Evidence and that the rules are the paramount authority guiding the trial judge's decision on admissibility of evidence. The State does not address the merits of Jones's hearsay argument concerning the confirmation report nor his argument regarding the violation of the physician-patient privilege, arguing instead that these issues are procedurally barred.
¶ 8. We will discuss first Jones's last argument regarding the non-waiver of the physician-patient privilege because if we rule that the physician-patient privilege precludes use of Jones's urine specimen, the State's case unravels at the seams. However, we begin by reciting our standard of review of a trial judge's decision to admit or deny evidence. That standard is an abuse of discretion standard. Johnston v. State, 567 So.2d 237, 238 (Miss.1990).

A. Physician-Patient Privilege
¶ 9. "Admission of evidence is within the discretion of the trial judge. That discretion must be exercised within the scope of the Mississippi Rules of Evidence, and reversal will only be had when an abuse of discretion results in prejudice to *213 the accused." Parker v. State, 606 So.2d 1132, 1137-38 (Miss.1992).
¶ 10. The physician-patient privilege exists as a result of statutory enactment and court promulgated rules. State v. Baptist Memorial Hospital-Golden Triangle, 726 So.2d 554 (¶¶ 10, 11) (Miss.1998); Miss.Code Ann. § 13-1-21(1) (Supp.2001); M.R.E. 503(b). Our supreme court has previously announced quite clearly that the physician-patient privilege applies with equal force in criminal proceedings as it does in civil cases. Cotton v. State, 675 So.2d 308, 312 (Miss.1996).
¶ 11. However, the physician-patient privilege is not an impenetrable fortress and contains a number of statutory exceptions. In Baptist Memorial Hospital-Golden Triangle (BMH-GT), the State, as a part of a criminal investigation of a homicide, issued a subpoena duces tecum and search warrant to BMH-GT for medical records of patients who were admitted or treated at BMH-GT for cuts and lacerations inflicted on any part of the patient's body from July 8-9, 1996. BMH-GT, citing Mississippi Code Annotated § 13-1-21 refused to honor the subpoena duces tecum. The trial court, relying upon the statutory physician-patient privilege, as well as the one created by the rules of evidence, quashed both the search warrant and the subpoena duces tecum. Baptist Memorial Hospital-Golden Triangle, 726 So.2d at 556 (¶ 1).
¶ 12. On appeal, the Mississippi Supreme Court reversed the trial court. In reaching its decision, the supreme court found some support in the fact that Mississippi Code Annotated § 45-9-31 requires medical personnel to report to law enforcement personnel information regarding persons who have been treated for injuries caused by gunshot or knifing. The court gave the following reasons for its decision:
The public interest in effective and efficient investigations into criminal activity outweighs the privacy rights of the individuals who would be affected by the subpoena duces tecum and the search warrant.
* * * * * *
Where there is an investigation into a serious and/or dangerous felony, public policy must override the rights of an individual. The privilege is to encourage the full disclosure by patients of their symptoms without fear of public disclosure. State v. Antill, 176 Ohio St. 61, 197 N.E.2d 548, 551 (1964). However, the needs of the patient to have his medical information remain confidential must be balanced against "the interest of the public in detecting crimes in order to protect society." Id. Where the evidence is necessary to the proper administration of justice, it is taken out of the physician-patient privilege.
Baptist Memorial Hospital-Golden Triangle, 726 So.2d at (¶¶ 2, 21).
¶ 13. The record is silent as to how the State became aware that Jones had tested positive for cocaine. Further the record does not indicate that a subpoena duces tecum or a search warrant was issued for the test results. Therefore, we are left uninformed as to how the State came into possession of Jones's medical records. We note, however, that, while Jones contends that the search and seizure were conducted unlawfully, he does not contend that the records were voluntarily given to the State. The record does reflect that five pages of a medical record were disclosed to Jones on April 8, 1999, and that on April 27, 1999, the State made a supplemental discovery disclosure which included the names of Cooper and Robinson, the two hospital employees involved in the retrieval and testing of Jones's urine specimen. *214 The disclosure also gave the substance of what Cooper's and Robinson's testimony would be. The record further reflects that two days later, on April 29, 1999, Jones filed a motion to suppress and a motion in limine.
¶ 14. In the motion to suppress, Jones alleged (1) that blood and urine samples were taken from him by the Bolivar County Hospital for use in the diagnosis and treatment of his injuries, (2) that in the criminal discovery furnished by the State, the laboratory reports of his test at the Bolivar County Hospital for his treatment were included, that he anticipated that the laboratory reports would be used at his trial, (3) that no search warrant was included in the State's discovery and that the taking of urine and/or the test results of the urine is a search covered by the Fourth Amendment to the United States Constitution, (4) that the discovery did not disclose a consent to search executed by the defendant and did not disclose a waiver of the medical privilege, and (5) that the search and seizure were "conducted unlawfully and in violation of the Fourth and Fourteenth Amendments to the United States Constitution, and of section 23 of the Constitution of the State of Mississippi in that said acts on the part of the State of Mississippi constituted an unreasonable search and seizure in violation of said provisions."
¶ 15. The trial judge overruled the motion to suppress. However, we do not know the basis for the trial judge's decision since the record does not contain an order or opinion disposing of the motion. We must therefore make our decision without the benefit of the trial judge's reasoning.
¶ 16. Our case is only slightly different from Baptist Memorial Hospital-Golden Triangle in that here, unlike in BMH-GT, there is no statute that requires Bolivar Medical Center to disclose the medical records to the State. However, we do not read the decision in BMH-GT to turn on the fact that the medical personnel were required by statute to report to law enforcement personnel information regarding persons who had been treated for injuries caused by gunshot or knifing. Rather, the decision turned on the public interest in the proper administration of justice, for the decision plainly holds that "[w]here the evidence is necessary to the proper administration of justice, it is taken out of the physician-patient privilege." Baptist Memorial Hospital-Golden Triangle, 726 So.2d at (¶¶ 2, 21).
¶ 17. Neither do we read the decision in McDuff v. State, 763 So.2d 850 (Miss.2000), as preventing the result we reach here. In McDuff, the Mississippi Supreme Court held that section 63-11-8 of the Mississippi Code of 1972 as annotated and amended is unconstitutional to the extent that it allows the results of a defendant's blood test into evidence when the blood is drawn in the absence of consent, probable cause, a warrant or incident to a lawful arrest. Id. at 855, 857 (¶¶ 16, 21).
¶ 18. In McDuff, the defendant lost control of her vehicle, crossed the center line and struck an on-coming vehicle, resulting in the death of the driver of the on-coming vehicle. McDuff was treated at the scene and transported to the Regional Medical Center in Memphis, Tennessee. Prior to her being transported, a law enforcement officer gave the treating E.M.T. a blood alcohol kit and requested that McDuff's blood be drawn at the hospital so that it could be tested for alcohol and drugs. While at the hospital, blood was drawn from McDuff for diagnostic purposes, but two tubes of blood were drawn pursuant to the request from the law enforcement officer. Id. at 852 (¶¶ 2-5)
*215 ¶ 19. The Mississippi Supreme Court reversed and remanded McDuff's conviction for negligently causing death while driving under the influence of alcohol, holding that the blood drawn at the request of law enforcement could not be used because of the absence of probable for having it drawn. However, the court further held that on retrial, the State would be permitted to use the blood which was drawn by the hospital for diagnostic purposes. Id. at 857(¶ 21).
¶ 20. One of the primary elements of Jones's crime requires proof that he was under the influence of cocaine. Although the urine specimen and test were not taken at the direction of a law enforcement officer, the specimen and resulting test results are the only source of evidence that Jones was driving under the influence of cocaine. A breath test was given to Jones by the officer, yet the breath test did not detect cocaine use. Without the results of the urine specimen and test, the State could not prove that Jones was under the influence of cocaine when he collided with Powell's automobile. Thus, to ensure the proper administration of justice, the medical records regarding the analysis of Jones's urine specimen must be removed from the protection of the physician-patient privilege.
¶ 21. Having determined that the medical records regarding the test conducted by Bolivar Medical Center, in the interest of the proper administration of justice, have to be removed from the protection of the physician-patient privilege, we hasten to add that our holding in this regard should not be interpreted as giving medical personnel the authority to voluntarily turn over medical records, except as mandated by law, to law enforcement officials. Since the record in this case does not inform us that Jones's records were voluntarily turned over to the State, nothing we say in this opinion should be interpreted as permitting the State to obtain, without proper process of law, medical records which are covered by the physician-patient privilege. We simply hold that on the facts presented here, it was not error to allow the result of the drug analysis, along with the testimony of the hospital employees who took the urine specimen and performed the analysis. We reach this conclusion because there is nothing in the record indicating that the medical records, which were allowed, concerned any other aspect of Jones's medical treatment. The medical records were limited to the drug analysis that was performed on his urine specimen.

B. The Absence of Approved Procedures and Permit
¶ 22. Mississippi Code Annotated § 63-11-19 (Supp.2001) provides in pertinent part as follows:
A chemical analysis of the person's breath, blood or urine, to be considered under the provisions of this section, shall have been performed according to methods approved by the State Crime Laboratory created pursuant to Section 45-1-17 and the Commissioner of Public Safety and performed by an individual possessing a valid permit issued by the State Crime Laboratory for making such analysis. The State Crime Laboratory and the Commissioner of Public Safety are authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the State Crime Laboratory.
¶ 23. As stated, Jones relies upon the dictates of the quoted statute and Johnston to undergird his argument that the results of the urine analysis were invalid *216 and should not have been allowed because the procedures for the analysis had not been approved by the State Crime Laboratory and the Commissioner of Public Safety and because Cooper did not possess a permit issued by the State Crime Laboratory. Additionally, Jones contends that the results should not have been admitted because the requirement of authentication or identification of the cocaine was not met. Consequently, he contends that the results of the analysis as well as all testimony connected therewith, including Cooper's, should not have been allowed.
¶ 24. Johnston involved an appeal of a DUI conviction predicated upon the test results of an intoxilyzer machine. The Mississippi Supreme Court, in reversing and remanding Johnston's conviction because the State failed to prove the intoxilyzer machine had been properly calibrated, quoted approvingly from the statute:
A chemical analysis of a person's breath, blood, or urine is deemed valid only when performed according to approved methods; performed by a person certified to do so; and performed on a machine certified to be accurate. Certification of the machines must take place at least quarterly. Miss.Code Ann. § 63-11-19 (1972). These safeguards insure a more accurate result in the gathering of scientific evidence through intoxilyzers and are strictly enforced. Where one of the safeguards is deficient the State bears the burden of showing that the deficiency did not affect the accuracy of the result.
Johnston, 567 So.2d at 238.
¶ 25. We do not find Johnston helpful to the resolution of the issue presented here because Johnston dealt primarily with compliance procedures for ensuring the accuracy of intoxilyzer machines. As reflected in the passage quoted above, Johnston does instruct that a chemical analysis of a person's blood is "deemed" valid only when performed according to approved methods and by a person certified to do so. However, we do not read Johnston to say that the result of a chemical analysis of a person's blood is inadmissible if it is not done by a permittee of the State Crime Laboratory in accordance with methods approved by the State Crime Laboratory. For sure, such an analysis would not be deemed as valid as one performed by a permittee in accordance with methods approved by the State Crime Laboratory. In such cases, the procedures used in the analysis must pass a test of reasonableness.
¶ 26. The case of Cutchens v. State, 310 So.2d 273 (Miss.1975), addresses the question of reasonableness regarding a blood test performed by a person without a permit issued by the State Board of Health. We find that this case offers significant guidance toward the resolution of our issue.
¶ 27. In Cutchens, the Mississippi Supreme Court was confronted with a fact situation almost identical to the one we have here. There, the appellant contended that the results of a blood analysis were invalid because "the chemical analysis of his blood was not performed by an individual possessing a valid permit issued by the State Board of Health for making such analysis under section 63-11-19." Cutchens, 310 So.2d at 277. In disposing of the appellant's contention, the Cutchens court held that "[t]he tests authorized by the Implied Consent Law are not exclusive.... This section does not limit the evidence of chemical tests to the chemical tests provided for by the Act, but permits the production of `any other competent evidence' bearing on the question of intoxication." Id. at 277-78.
¶ 28. We note, however, that the Cutchens court, in reaching its decision, relied *217 primarily on section 63-11-39(2) of the Mississippi Code of 1972 as annotated and amended which has since been repealed. That section, as it existed then, provided that "[n]o provisions of this chapter [chapter containing the provisions of the Implied Consent Law] shall be construed as limiting the introduction of any other competent evidence bearing upon the question whether or not the person was under the influence of intoxicating liquor." Miss.Code Ann. § 63-11-39(2) (repealed 1991).
¶ 29. We further note that the Cutchens court, although relying primarily on the statutory language of the now repealed section, also cited Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), which applied a test of reasonableness to the procedures utilized in tests designed to measure the blood-alcohol level of persons charged with crimes. Cutchens, 310 So.2d at 278. After quoting an extensive passage from Schmerber, the Cutchens court opined:
Since the tests authorized in the Implied Consent Law are not the exclusive tests that may be used to determine the blood-alcohol level in the body of a person, the question then presents itself, was a reasonable test performed on Cutchens?
Id.
Finally, the court in Cutchens concluded its consideration of the issue with a discussion of the qualifications of the persons involved in performing the blood analysis, and held as follows:
It is unquestioned that Cutchens' blood was withdrawn and the test performed by persons qualified to perform such functions. No question is raised as to the procedures used by Mrs. Shows and Dr. Hume. We therefore hold that the test was reasonable and the results thereof admissible as other competent evidence under section 63-11-39(2).
Id.
¶ 30. Although section 63-11-39, which expressly authorized admission of "any other competent evidence" bearing upon the issue of whether a person was intoxicated, has been repealed, it is not debatable that, in DUI cases, evidence regarding intoxication is not limited to evidence presented by the State from persons who hold a State Crime Laboratory permit to analyze blood, urine and breath samples. Mississippi Code Annotated § 63-11-13 (Rev.1996) makes clear that test results from persons performing analyses at the behest of the accused may be admitted. The pertinent portion of this section reads:
The person tested may, at his own expense, have a physician, registered nurse, clinical laboratory technologist or clinical laboratory technician or any other qualified person of his choosing administer a test, approved by the State Crime Laboratory created pursuant to section 45-1-17, in addition to any other test, for the purpose of determining the amount of alcohol in his blood at the time alleged as shown by chemical analysis of his blood, breath or urine.

Miss.Code Ann. § 63-11-13 (Rev.1996) (emphasis added).
¶ 31. While section 63-11-13 addresses tests offered by the accused, it seems to us that it would constitute an anomaly in the law to allow the accused to present evidence of test analyses done by persons other than those licensed by the State Crime Laboratory, while, at the same time, preventing the State from using such analyses. Additionally, we find that the language in section 63-11-13, regarding "any other test" is comparable to the language in section 63-11-39(2) which was repealed. As previously observed, section 63-11-39(2) authorized admission of "any *218 other competent evidence" bearing upon the issue of whether a person was intoxicated. Clearly "any other test," properly administered under appropriate procedures and designed to determine the alcohol or drug content of one's blood or urine, constitutes other competent evidence. We therefore find that the trial court did not err in refusing to exclude the results of the urine analysis done by Cooper simply because she did not hold a valid permit from the State Crime Laboratory.
¶ 32. Having determined that no per se exclusion applies to the test analysis done by Cooper, we look to see, as did the Cutchens court, whether the procedures utilized were reasonable. In this regard, we first point out that Jones makes no complaint about the reasonableness of the procedures, having chosen instead to place all of his bets on a per se exclusion. Nevertheless, as stated, we must look to see if the procedures utilized were reasonably designed to produce credible results.
¶ 33. Clint Robinson, an emergency room registered nurse employed with the Bolivar Medical Center, after identifying a copy of Jones's medical records, testified that he took a urine specimen for a drug screen from Jones and delivered it to the hospital laboratory for the purpose of having a drug screen performed. He further testified that he had been a registered nurse since 1995 and had been employed with Bolivar Medical Center since he became a registered nurse.
¶ 34. Betty Ann Cooper, the person who analyzed Jones's urine specimen, testified that she was a medical technologist employed with the Bolivar Medical Center Laboratory. She had been employed there for nine years. Prior to her employment with Bolivar Medical Center, she had worked for thirty years as a medical technologist. She holds a bachelor of science degree in medical technology from the University of Tennessee as well as Delta State University. She identified the test that she performed on Jones's urine specimen as the triage drugs of abuse screening test. She had performed this specific test hundreds of times. She testified that each triage test kit comes with instructions and that she had read the instructions. She further testified that, pursuant to standard hospital policy, her findings have to be confirmed and that in Jones's case, the findings were confirmed by MPL. Cooper identified the confirmation test performed by MPL as being the thin layer chromatography. The laboratory report prepared by Cooper on Jones's urine specimen was admitted into evidence as exhibit 14, and the confirmation report prepared by MPL was admitted as exhibit 15.
¶ 35. Dr. Steven Hayne, the pathologist for the State Department of Public Safety, was qualified as an expert in the areas of forensic, clinical and anatomical pathology. Dr. Hayne reviewed the laboratory report prepared by Cooper and the report prepared by MPL. He testified that both reports indicated that cocaine was present in Jones's urine specimen. He explained that the threshold level for a positive indication of cocaine, in the methodology employed in the triage test, would be three hundred nanograms per deciliter. He further explained that the thin layer chromatography test is a qualitative test rather than a quantitative test but that it can be used as a semi-quantitative test. He testified that the thin layer chromatography test is more sensitive than the triage screening test. Finally, he explained the methodology of the thin layer chromatography test.
¶ 36. On the facts presented, we find that the test was administered by a person qualified by experience, training and education. Clearly Cooper, with forty years of experience in performing the analysis which was performed in this case, is more *219 than qualified by experience and training. Additionally, as previously observed, she is also qualified by educational achievement, having a bachelor of science degree in medical technology. While Jones's counsel vigorously cross-examined both Cooper and Dr. Hayne, he did not question the procedures utilized by Cooper in performing the analysis. Additionally, while counsel questioned both Cooper and Dr. Hayne about the threshold level for a positive indication for the presence of cocaine, according to the methodology employed in the triage test, he did not question the credibility of the test as a diagnostic instrument for the detection of drugs in the human system. Consequently, we hold that the test was reasonable and the results admissible.

C. Admission of the Confirmation Report
¶ 37. The State asserts that the MPL confirmation report was not objected to in a timely manner, yet the record reflects that counsel for Jones timely objected twice during the course of the trial. First, it was objected to as hearsay upon being marked as an exhibit. Second, upon admission into evidence, it was objected to on Sixth Amendment grounds.
¶ 38. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). Furthermore, without the testimony of a sponsoring witness with personal knowledge of the facts contained therein, a report is inadmissible, rank hearsay. Balfour v. State, 598 So.2d 731, 749 (Miss.1992). Thus, the confirmation report was inadmissible hearsay. Additionally, admission of such a report violates Jones's Sixth Amendment right to confrontation because Jones had no opportunity to cross-examine the conclusions of the Memphis laboratory.
¶ 39. Although we have determined that the confirmation report was improperly admitted, this Court must conclude that the admission was harmless error because admission of the initial test performed by Cooper contained the same evidence, proof of cocaine in Jones's urine. There is no evidence in the record contradicting Cooper's findings. Indeed, Dr. Hayne testified concerning the analysis performed by Cooper and agreed that the test employed by Cooper was an acceptable drug screening test. Even if the confirmation report had not been admitted, the jury was entitled to consider and rely upon the results of the analysis done by Cooper. While we cannot say without any doubt that the confirmation report did not have any bolstering effect of the State's evidence, we are confident that Cooper's and Dr. Hayne's testimony alone was sufficient to support the jury's verdict. While Jones had no obligation to offer any evidence contradicting Cooper's findings, if such was available, he most surely must bare the consequence of not placing anything before the jury for them to consider in light of the State's evidence.

2. Denial of Motion for Directed Verdict
¶ 40. Jones frames his issue as error of the trial court in denying his motion for a directed verdict but argues both sufficiency and weight of the evidence issues. He sets forth three arguments under this issue. First, the analysis of the urine and the person testing the urine were invalid for the reasons as set forth above. Second, the use of the confirmation report from Memphis Pathology Laboratory was inadmissible as hearsay and a denial of the defendant's rights under the Sixth Amendment to the U.S. Constitution. *220 Third, there was no waiver of the physician-patient privilege.
¶ 41. The standard for evaluating a directed verdict is well established in our jurisprudence. Once the jury has returned a verdict of guilty in a criminal case, we are not at liberty to direct that the defendant be discharged short of a conclusion on our part that given the evidence, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty. Sullivan v. State, 749 So.2d 983(¶ 24) (Miss.1999). This Court will reverse only where one or more elements of the offense are not proven. McClain v. State, 625 So.2d 774, 778 (Miss.1993).
¶ 42. On the other hand, a reviewing court will not reverse and remand for a new trial on the basis that the verdict is against the overwhelming weight of the evidence unless it can conclude that allowing the verdict to stand will sanction an unconscionable injustice. McClain, 625 So.2d at 781.
¶ 43. We have already determined that Cooper's analysis of Jones's urine was properly admitted. That analysis shows that Jones had cocaine in his system at the time of the accident. The jury in this case listened to all of the testimony and concluded that the State had made its case. We cannot say that a reasonable, hypothetical juror could not find beyond a reasonable doubt that the defendant was guilty or that allowing the verdict to stand would sanction an unconscionable injustice. Consequently, we affirm Jones's conviction and sentence.
¶ 44. THE JUDGMENT OF THE CIRCUIT COURT OF BOLIVAR COUNTY OF CONVICTION OF VEHICULAR HOMICIDE AND SENTENCE OF TWENTY YEARS WITH FIVE YEARS SUSPENDED AFTER SERVING FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO BOLIVAR COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS AND CHANDLER, JJ., CONCUR. GRIFFIS, J., NOT PARTICIPATING.
NOTES
[1] It is not made clear in the record as to how the State became aware of the urine analysis that was performed by Bolivar Medical Center.