440 So.2d 547 (1983)
Tony PENICK, Appellant,
v.
STATE of Mississippi, Appellee.
No. 53805.
Supreme Court of Mississippi.
October 12, 1983.
Rehearing Denied November 30, 1983.
V. Douglas Gunter, Jackson, for appellant.
Bill Allain, Atty. Gen., Frankie Walton White, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and HAWKINS and PRATHER, JJ.
HAWKINS, Justice for the Court:
Tony Penick appeals from his conviction in the Circuit Court of Rankin County of the possession of more than one ounce, but less than one kilogram, of marijuana in violation of Miss. Code Ann. § 41-29-139(d)(2)(C) (1972, as amended) and a sentence of three years.
The only issue we address upon this appeal is the legality of the search of Penick and his possessions. The circuit judge ruled the search valid; persuaded otherwise, we reverse and remand.

FACTS
In mid-afternoon on April 2, 1980, Penick, a native of Jackson, arrived at the Jackson Municipal Airport on a flight from Fort Lauderdale, Florida.
Also at the terminal were Ernest S. Jacobsen, special agent with the Drug Enforcement Administration, Mickey Robbins, an agent with the State Bureau of Narcotics, and other state drug agents. This federal and the state agents were there on an investigation unrelated to Penick.
Penick and Jacobsen were well acquainted, Penick being an informant for Jacobsen in his investigation into illicit drug trafficking, and, according to Jacobsen, he had contacted Penick on a daily basis for six to eight months.
*548 Jacobsen testified that when Penick observed him he became "very nervous." Nevertheless, Penick walked over and talked to Jacobsen. Penick asked Jacobsen what he was doing at the airport, and Jacobsen replied he was there to see a friend off on a plane.
Penick left, saying he had to make a phone call, and proceeded to a phone booth in the main terminal. Jacobsen said he observed Penick "peeking around the phone booth watching me." Suspecting Penick, Jacobsen then notified other narcotic agents to keep their eye on Penick, that he, Jacobsen, was going to leave the terminal.
Penick left the phone booth, went to a restroom, and then walked outside the terminal to his pickup in the parking area.
As he got to his pickup, Penick was stopped by Robbins. Robbins identified himself as a state narcotics agent and was talking to Penick when Jacobsen walked over.
Jacobsen asked Penick to accompany them back to the airport and Penick went with them to a police office in the terminal. Penick testified he thought he had to go with them. Jacobsen and Robbins both testified Penick appeared nervous and, according to Robbins, Penick "appeared that he didn't want to talk to anybody and he became upset when he got inside the police office there."
When they got into the police office, Jacobsen and Robbins exited, leaving Penick behind with two police officers. According to Penick, he was told to "stay there," and could not leave. Jacobsen said if Penick had wanted to leave, he would have had to go through him, but could have left.
Jacobsen and Robbins returned, took Penick across the hall and began questioning him as to where he had been, where his ticket was, and whether he had any luggage.[1]
Penick undressed, there was no contraband on his person, and Robbins left the room as Penick was putting his clothes back on.
The events immediately preceding Penick removing his clothes and what then transpired are in dispute.
According to Penick, following the questioning, he was told to empty his pockets, which he did, and then told to take off his clothes. He testified he did not feel he had a right to leave or to do other than as he was told, that the officers were direct and forceful. He said they found a claim ticket and Jacobsen told Robbins to go get the luggage. When Robbins returned with the suitcase, the officers opened it with a screwdriver.
According to Jacobsen, when he and Robbins took Penick across the hall and were questioning him, Penick was "acting real nervous," and said: "I guess you want me to  want to search me, don't you?" Jacobsen testified he said, "Well, yes, if you don't mind." and Penick then took his clothes off.
Jacobsen testified that following the search and, as Penick was putting his clothes back on, a baggage receipt slip fell on the floor. Jacobsen testified that as he reached down to pick it up, Penick said, "Damn, Jake, I've got two pounds of grass in my bag."
Jacobsen then walked to the door where Robbins was waiting outside and gave him the luggage ticket to go and get the bag.
According to Jacobsen, when the luggage was returned, Penick attempted to open the bag by the combination lock, but, being unable to do so, a screwdriver was used to open the bag. The marijuana was discovered inside and then Penick was placed under arrest and given the conventional Miranda warnings.
Robbins was not present at the time the baggage receipt was picked up by Jacobsen. He testified when the bag was retrieved, Penick opened it from a combination lock, he did not recall the screwdriver being used.
The first trial of Penick resulted in a hung jury and a mistrial. Robbins, who *549 left the job as narcotics agent and was privately employed, did not testify at the first trial. He did testify at the second trial.
Penick made a pretrial motion to suppress the evidence, claiming his constitutional right against unreasonable search and seizure had been violated. Following hearing, at which Penick and Jacobsen testified, the motion was overruled.
Thereafter in both trials, and over Penick's objection, the evidence of marijuana found in the luggage was introduced before the jury.
Upon this appeal Penick assigns as error the trial judge's overruling his motion to suppress.

LAW
Section 23 of the Mississippi Constitution provides:
Section 23. The people shall be secure in their persons, houses, and possessions, from unreasonable seizure and search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized.
The Fourth Amendment to the United States Constitution provides:
AMENDMENT IV. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Was there a search and seizure in this case in violation of these Constitutions' provisions?
We will refer first to our State Constitution as we have interpreted it over the years.
We do not have before us a search made as an incident to Penick's arrest. This is not even contended by the state. Rather, it is the contention of the state that Penick consented to the search.
We agree with the astute and experienced circuit judge's observation that there are "pickup truck loads" of cases on these issues. Our task cannot be to remove the nettlesome questions presented in search and seizure cases, but we will endeavor to avoid adding to the confusion. Yet, the razor's edge gradation between search and seizure cases is often so difficult to define or delineate under the conventional principles we must apply in explaining our reasons, we are compelled to repeat the refrain: each of these cases must be judged on its own facts. We can go little further.
In Smith v. State, 133 Miss. 730, 98 So. 344 (1923), a search of the defendant's home was challenged as being violative of her rights against unreasonable searches under Section 23 of our state Constitution. On the question of whether the defendant had consented to a search of her home, we stated:
[T]he occupant, as a matter of legal right, stands objecting to any unlawful search of her premises; and in order to waive her rights it must clearly appear that she voluntarily permitted, or expressly invited and agreed to the search, being cognizant of her rights in the premises when the officer proposed to her, by asking her permission, to make the search without a warrant. [Emphasis added] 133 Miss. at 736, 98 So. at 345.
This case is also authority for the principle that where an accused neither consents to nor objects to the search, this does not constitute a waiver.
Smith v. State has been cited in numerous subsequent decisions of this Court. See: Morton v. State, 136 Miss. 284, 101 So. 379 (1924); Boyd v. State, 164 Miss. 610, 145 So. 618 (1933); Lancaster v. State, 188 Miss. 374, 195 So. 320 (1940); Martin v. State, 217 Miss. 506, 64 So.2d 629 (1953).
Quan v. State, 185 Miss. 513, 188 So. 568 (1939), again regarding Section 23 of our state Constitution, we stated: "A party, when he knows that a proposed search would be illegal, may waive the illegality *550 and consent to the search; and when he does he may not thereafter complain of its illegality." [Emphasis added] 185 Miss. 513, at 520, 188 So. at 569.
In order for there to be a valid consent to a search not otherwise authorized by law, must the person searched be aware he has the legal right to refuse? Put in a different way, in order for there to be a valid waiver of the Constitutional right against an illegal search, is it necessary that the person searched be aware of his right under the law to refuse?
Smith v. State and Quan v. State would clearly seem to answer both these questions "yes."
Of course, the best way to prove a defendant had knowledge he did not have to consent to the search is for the officer to have told him. This was not done in this case. Penick testified he thought he was required to do as he was told, and he was told to empty his pockets and undress.
The state's proof to the contrary is tenuous, at best. The most the state offers on this is Jacobsen and Robbins testifying that Penick, while nervous and upset during their questioning of him, asked, "Do you want to search me?". This question could as well have been an inquiry as an offer. According to Robbins, Jacobsen simply said, "Yes."
This can hardly constitute clear evidence of knowledge on the part of Penick that he had a right to refuse.
A much more recent case of Luton v. State, 287 So.2d 269 (Miss. 1973) would at first appear to cast some cloud on the rule announced in Smith v. State. In Luton the officers had lawfully arrested the defendant under a warrant, given him the full Miranda warnings, and then asked for permission to search the trunk of his car. At trial, he objected to objects found in the trunk being introduced into evidence. We there held that where the state relied on consent to a warrantless search, the standard to prove the waiver and consent was beyond a reasonable doubt. 287 So.2d at 271-72.
The defendant argued, however, that his Fourth Amendment right had been violated because the state had not proved he knew he had the right to refuse. We rejected the argument of a violation of his Fourth Amendment right under a then-recent U.S. Supreme Court decision, Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In that decision the majority of the U.S. Supreme Court held proof of knowledge of the right to refuse was not in and of itself a necessary pre-requisite to admission of the evidence, but was a factor to be considered from a totality of the circumstances by the trial court in making a determination of whether there had been a valid consent. We will return to Schneckloth v. Bustamonte later in analyzing whether there was a Fourth Amendment violation.
The determination of whether there has been a constitutional violation of the protection against unreasonable searches and seizures, as we have above stated, depends on the facts of each case. It is obvious that there is a vast factual difference between Luton and this case. Luton was under a lawful arrest, based upon a warrant for his arrest, he had been given full Miranda warnings, including the right to counsel, right to remain silent, and then consented to a search of his car.
In this case there was no reasonable ground to place Penick under arrest, he was not under arrest, and no warning of any kind as to his rights was given before he was told to undress.
Again, in Cutchens v. State, 310 So.2d 273 (Miss. 1975), we cited Schneckloth v. Bustamonte in rejecting a defendant's argument that the Fourth Amendment to the U.S. Constitution required the state to prove the defendant had been informed of his rights before a blood test was taken from him. Nor, was the state required to prove he knew he had a right to refuse as a pre-requisite to admission of results of the test. Rather, this was a factor to be considered by the trial judge from the totality of the circumstance as to whether the consent had been freely given.
*551 In Cutchens we approved our holding in Luton. On the facts, there is a marked distinction between Cutchens and this case. In Cutchens there had been an automobile accident in which a person was killed. The officer, who was acquainted with the defendant, saw the defendant in the emergency room of the hospital smoking, where there was a "no smoking" sign. As he approached the defendant to tell him to put out his cigarette, he smelled alcohol on the defendant's breath. The defendant admitted drinking, and the officer asked a medical technologist to remove blood. The medical technologist explained the purpose of the blood sample to the defendant, who thereupon signed a written consent to take his blood, and made no objection to the removal of his blood.
In Cutchens, under the authority of Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the officer had a lawful right to remove the defendant's blood whether he consented or not. The taking of a blood sample from Cutchens was a lawful incident to his arrest for the charge of manslaughter by operating a motor vehicle while under the influence of intoxicating liquor. Schmerber v. California should put to rest any contention that taking a blood sample as a lawful incident to an arrest for driving while intoxicated violates either the Fourth, Fifth or Sixth Amendments to the U.S. Constitution.
Finally, in Cutchens and Luton we were not asked to address a violation of Section 23 of our state Constitution.
We believe Smith v. State was a sound holding in interpreting Section 23 of our state Constitution, and we do not abandon our ruling therein in the interpretation of our state Constitution.
In Luton and Cutchens we were bound to follow the holding of the U.S. Supreme Court's interpretations of the Fourth Amendment to the U.S. Constitution. Yet, neither consistency nor wisdom would be served by our overruling or diluting our own interpretation of Section 23 of our state Constitution.
We accord to the U.S. Supreme Court the utmost respect in its interpretation of the U.S. Constitution. We must, however, reserve for this Court the sole and absolute right to make the final interpretation of our state Constitution and, while of great persuasion, we will not concede that simply because the U.S. Supreme Court may interpret a U.S. Constitutional provision that we must give the same interpretation to essentially the same words in a provision of our state Constitution. This is especially true of a decision from that Court in which the proponents for opposing points of view each give clear and cogent argument in support of their respective positions. Indeed, so lucid, that Court is so sharply divided that a change in a single member's point of view would change the result in the case.
Our necessary holding in Luton and Cutchens, following the U.S. Supreme Court's interpretation of the Fourth Amendment should not be construed as diminishing or diluting the strength of Smith v. State and Quan v. State in their interpretation of Section 23.
We, therefore, hold that under Section 23 of the Mississippi Constitution, and the facts of this particular case, the state failed to prove beyond a reasonable doubt or by clear evidence that there was a knowledgeable waiver by Penick of his state constitutional right not to be searched.
In this case the investigation, search and arrest of Penick was virtually a solo performance by an officer of a United States agency. Yet, Penick was not charged and prosecuted in a United States District Court as he could have been for possessing and transporting marijuana. Instead, he was charged and prosecuted in a state court. In a United States District Court, our state Constitution would offer no obstacle to the validity of his search and arrest.
The seizure and search in this case also violated the Fourth Amendment to the U.S. Constitution, under decisions of the U.S. Supreme Court, albeit for reasons we have not addressed under our Section 23, and do not address in this case. In following *552 the U.S. Supreme Court on Fourth Amendment construction, we do not necessarily hold we would interpret Section 23 in precisely the same manner. The words of our Mississippi Constitution are not balloons to be blown up or deflated every time, and precisely in accord with the interpretation the U.S. Supreme Court, following some tortuous trail, is constrained to place upon similar words in the U.S. Constitution. Putting the matter another way, although the sheet music might appear the same, in reading the musical score of our Mississippi Constitution we are not required to play the same tune the U.S. Supreme Court may play in its rendition from the musical score of the U.S. Constitution.
The U.S. Supreme Court has had occasion to make more detailed and intensive review of Fourth Amendment rights than we have. We will examine those cases which lead us to conclude there was a Fourth Amendment violation here.
In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a detective with over 30 years experience with shoplifters and pickpockets observed three men acting suspiciously in front of a store. Two of them walked back and forth in front of a store window six times each, peering into the store. They then conferred with a third man on the corner and returned to the store window, looking inside. The two men followed the third man. The officer considered it his duty to investigate. He followed the two until they met up with the third.
Apprehending they might be armed, the officer approached them, identified himself as a police officer, and asked their names. Hearing only a mumble, the officer grabbed one of them, Terry, and spun him around so he and Terry were facing the other two. The officer then patted the outside clothing of Terry and felt a pistol, which he removed. In like manner he "frisked" the others and found a concealed weapon on one of them.
Terry was prosecuted for carrying a concealed weapon. He challenged the seizure and search as a violation of his Fourth Amendment rights.
The U.S. Supreme Court held that under the Fourth Amendment there was a seizure of Terry when he was grabbed by the officer and a search when the outside of his clothing was patted. The Court also found, however, that although the officer did not have probable cause for arrest, he did have reasonable reason and authority to stop these individuals for a momentary investigation to ask a few questions, and in the exercise of this authority under the circumstances, for his own protection to make this limited seizure and search for weapons. The search and seizure in this case was held to have been reasonable and therefore valid.
The Court stated:
Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonable prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. Terry v. Ohio, 392 U.S. 1 at 27, 88 S.Ct. 1868 at 1883, 20 L.Ed.2d at 909.
And
Each case of this sort will, of course, have to be decided on its own facts. We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel *553 his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken. [Emphasis added] 392 U.S. 1 at 30, 88 S.Ct. at 1884, 20 L.Ed.2d at 911.
A close examination of Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) reveals that case is of little benefit to the state here. Bustamonte was a passenger, and one of six people, in an automobile stopped by police officers. The owner of the car was not in the automobile, but his brother Alcala, was. The driver had no driver's license. The officers asked Alcala if they could search the car, and he replied, "Sure, go ahead." There was no threat of any kind, and Alcala helped in the search by voluntarily opening the glove compartment and trunk with keys. Wadded up under the rear seat were three stolen checks, which were offered in evidence in a trial against Bustamonte. On the motion to suppress the evidence, neither Alcala nor Bustamonte testified.
The question before the U.S. Supreme Court was whether the state of California was required to prove, as a pre-requisite to the introduction into evidence of the checks, that there was knowledge on the part of Alcala that he had the legal right to refuse permission to search.
The U.S. Supreme Court held it was not necessary for the state to offer this proof as a pre-requisite to introduction of the evidence.
The Court concluded:
Our decision today is a narrow one. We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a pre-requisite to establishing a voluntary consent. [Emphasis added] Schneckloth v. Bustamonte, 412 U.S. at 248, 93 S.Ct. at 2059, 36 L.Ed.2d at 875.
In any case in which trial courts seek to give effect to the holding in Bustamonte, it would be well to note the following footnote in Bustamonte:
[T]he present case does not require a determination of the proper standard to be applied in assessing the validity of a search authorized solely by an alleged consent that is obtained from a person after he has been placed in custody. We do note, however, that other courts have been particularly sensitive to the heightened possibilities for coercion when the "consent" to a search was given by a person in custody. 412 U.S. at 241, n. 29, 93 S.Ct. at 2055, n. 29, 36 L.Ed.2d at 870-871, n. 29. See also n. 36.
In holding the consent to have been voluntary, the Court also saw fit to note the circumstances under which it was given, as opposed to a person in a custodial interrogation.
Indeed, since consent searches will normally occur on a person's own familiar territory, the specter of incommunicado police interrogation in some remote station house is simply inapposite. There is no reason to believe, under circumstance such as are present here, that the response to a policeman's question is presumptively coerced... . [Emphasis added] 412 U.S. at 247, 93 S.Ct. at 2058, 36 L.Ed.2d at 874.
The thrust of Bustamonte is that in determining whether there has been a valid consent to some routine search, the Court will not make the same rigorous examination to determine whether there has been a conscious, deliberate waiver of known legal *554 rights and knowledge of the full impact and consequence of such waiver, as will be applied in a confession, or more especially in guilty pleas or waiver of counsel made in court proceedings.
In Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the defendant had been arrested without probable cause. While in custody and having received Miranda warnings, he confessed to a murder. The confession would have been admissible under the Fifth Amendment. The Court addressed the question of whether his "illegal" arrest, a "seizure" under the Fourth Amendment, vitiated the confession, rendering it inadmissible.
The Court held that in this situation the duty was upon the prosecution to prove from all the facts in the case that the casual chain between the illegal arrest and the confession had been broken. Was the confession, in effect, the "fruit of the poisonous tree" of the illegal arrest?
Again, the Court stated the facts in each case had to be examined. In this case the confession came about two hours following arrest, for investigation, and the Court held the confession came about as a result of the illegal arrest, and was therefore inadmissible.
The Court stated rights under the Fourth and Fifth Amendments frequently appeared to coalesce since searches and seizures under the Fourth Amendment were almost always made for the purpose of compelling a man to give evidence against himself and condemned by the Fifth Amendment.
In Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the accused was taken into custody by the police for questioning, and after being fully warned of his rights, gave a confession. The U.S. Supreme Court, following the rationale of Brown supra held the confession inadmissible under Dunaway's Fourth Amendment rights.
In the United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the border patrol stopped a car in which the three occupants appeared to be of Mexican descent. The driver was charged with transporting illegal aliens. He challenged the stop as being violative of his Fourth Amendment rights. The Court stated:
[B]ecause of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in Terry, the stop and inquiry must be "reasonably" related in scope to the justification for their initiation. (392 U.S., at 29, 88 S.Ct. 1868 [at 1884], 20 L.Ed.2d 889). The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.
In United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), a young black woman, who appeared to fit the "drug courier profile,"[2] was approached and stopped by federal agents in the main concourse of the Detroit Municipal Airport as she left a plane.
The agents identified themselves when they stopped her, and asked to see her identification and airline ticket. Her driver's license showed her name to be Mendenhall, but the ticket was in the name of "Annette Ford." After another question or two, an agent asked her if she would accompany them to their office for further questions.
*555 When they got to the office, the first question she was asked was whether she would permit a search of her person and handbag, but also told her she had the right to decline the search if she desired.
Mendenhall consented to the search, and a policewoman was summoned to conduct the search. The policewoman asked the federal agents if Mendenhall had consented to be searched, and they replied she had. Then, Mendenhall followed the policewoman into a private room. She was again informed she had the right to refuse a search. The search revealed heroin.
In Mendenhall, as distinguished from this case, the suspect clearly was informed she had the right to refuse the search.[3]
The question before the U.S. Supreme Court was not whether Mendenhall had consented to the search, but whether prior to this search, there had been an unlawful violation of Mendenhall's Fourth Amendment rights vitiating the subsequent search. It was conceded, as in this case, that there was no probable cause for an arrest.
By a five to four decision, the majority held no seizure had occurred because Mendenhall's conduct up to the time she was asked if she consented to be searched was voluntary. The majority opinion held no seizure had occurred.
We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See Terry v. Ohio, supra, 392 U.S. at 19, n. 16, 88 S.Ct. at 1879, n. 16; Dunaway v. New York, 442 U.S. 200, 207 at n 6, 99 S.Ct. 2248, 2253 [at n. 6], 60 L.Ed.2d 824; 3 W. LaFave, Search and Seizure 53-55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. [Emphasis added] 446 U.S. at 554-55, 100 S.Ct. at 1877, 64 L.Ed.2d at 509-10.
The Court held there was no seizure in momentarily stopping Mendenhall in the main concourse. The Court also held that from a totality of the circumstances Mendenhall voluntarily consented to go with the officers to their office. On the motion to suppress, Mendenhall did not testify, while in this case Penick did.
In the Court's view there was nothing about the officers' testimony indicating anything except her decision to go to the office was free and voluntary. Her ticket and identification had been returned to her, and there was no show of force or threat of any kind when she was asked to accompany the officers to their office.
Four members of the Court disagreed. The dissenters were of the opinion Mendenhall was seized when there was no probable cause for arrest and the government did not meet its burden of showing Mendenhall voluntarily accompanied the officers to their office.
In Florida v. Royer, ___ U.S. ___, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the defendant was observed at the Miami International Airport by two state of Florida narcotics officers to fit the "drug courier profile."[4]
Royer, unaware of the attention he was receiving, purchased an airline ticket to *556 New York, and put the name "Holt" on the luggage identification tag.
The two agents approached him, identified themselves as policemen working for the Dade County Sheriff's Office, and asked if he had a moment to speak to them. Upon this request, Royer produced his driver's license and airline ticket. The airline ticket, like the luggage ticket, had the name "Holt." Royer became nervous, and the agents told him they were narcotics agents and suspected him of carrying narcotics. The officers did not return his airline ticket and identification, and asked Royer to accompany them to a room approximately 40 feet away. Royer accompanied them without reply. He was taken to a private room and one of the agents, using Royer's ticket, retrieved the luggage. Royer was not asked for permission to retrieve the luggage.
When the luggage was brought into the room, Royer was asked if he would consent to a search of the suitcases. Without response, Royer produced a key and unlocked one of the suitcases himself, which the detective opened. Marijuana was found in the suitcase. The second suitcase had a combination lock and Royer was asked if he objected to prying the suitcase open; he replied, "No, go ahead." The suitcase was then pried open and more marijuana was found. Royer was then placed under arrest. Approximately fifteen minutes had lapsed from the time Royer was first approached until his arrest, following discovery of the marijuana.
Royer made a motion to suppress the evidence and testified.
The Florida District Court of Appeals held that Royer had been involuntarily confined and the officers in effect had arrested Royer. The Florida court then concluded that Royer's consent to search, given only after he had been illegally confined, was ineffective to justify the search and the search was invalid under the Fourth Amendment to the U.S. Constitution. The State of Florida was granted an appeal by the U.S. Supreme Court to determine whether there had been a Fourth Amendment violation.[5]
The U.S. Supreme Court affirmed. The Supreme Court held the burden was upon the state to prove a free and voluntary consent to search, and it was not proved merely by showing the suspect had submitted to authority. The Court also held, under Terry v. Ohio, that officers do not violate Fourth Amendment rights by merely approaching an individual on the street or in a public place and asking him if he is willing to answer some questions and, if so, interrogating him briefly. The Court held that "reasonable suspicion" of crime was insufficient to justify a "custodial interrogation" or a full search of a person.
In holding the Fourth Amendment "seizure" of Royer vitiated the subsequent search, the Court stated:
Terry and its progeny nevertheless created only limited exceptions to the general rule that seizures of the person require probable cause to arrest. Detentions may be "investigative" yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person, or of his automobile or other effects. Nor may the police seek to vary their suspicions by *557 means that approach the conditions of arrest. Dunaway v. New York, supra, made this clear... .
... The scope of the detention must be carefully tailored to its underlying justification.
... Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. ___ U.S. at ___, 103 S.Ct. at 1325, 75 L.Ed.2d at 237, 238.
The Court went on to state that the burden was upon the state to prove the seizure was sufficiently limited in scope to justify what was done.
The Court stated, 103 S.Ct. at page 1326: Sixth, if the events in this case amounted to no more than a permissible police encounter in a public place or a justifiable Terry-type detention, Royer's consent, if voluntary, would have been effective to legalize the search of his two suitcases... . The Florida Court of Appeal in the case before us, however, concluded not only that Royer had been sized when he gave his consent to search his luggage but also that the bounds of an investigative stop had been exceeded. In its view the "confinement" in this case went beyond the limited restraint of a Terry investigative stop, and Royer's consent was thus tainted by the illegality, a conclusion that required reversal in the absence of probable cause to arrest. The question before us is whether the record warrants that conclusion. We think that it does. ___ U.S. at ___, 103 S.Ct. at 1326, 75 L.Ed.2d at 238-239.
In rejecting to the State's claim that at the time Royer consented to the luggage search, he was not being legally detained, the Court stated:
We find this submission untenable. Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purpose of the Fourth Amendment. These circumstances surely amount to a show of official authority such that "a reasonable person would have believed he was not free to leave." Citing Mendenhall, supra, (opinion of Stewart, J.) ___ U.S. at ___, 103 S.Ct. at 1326, 75 L.Ed.2d at 239.
What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous examinations, sought to confirm their suspicions... . Royer was never informed that he was free to board his plane if he so chose, and he reasonably believed that he was being detained ... As a practical matter, Royer was under arrest. ___ U.S. at ___, 103 S.Ct. at 1327, 75 L.Ed.2d at 240.
And
We do not suggest that there is a litmuspaper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment. Nevertheless, we must render judgment, and we think that the Florida Court of Appeal cannot be faulted in concluding that the limits of a Terry-stop had been excluded. ___ U.S. at ___, 103 S.Ct. at 1329, 75 L.Ed.2d at 242.
The Court concluded that any consent Royer gave was tainted by the illegality of his "seizure," and therefore ineffective.
The majority opinion never addressed the question of Schneckloth v. Bustamonte, whether it was necessary that Royer have known that he had a right to decline the *558 search. It seems to hold that whether he freely and voluntarily consented to the search or not was immaterial, because he had in effect been placed under arrest without probable cause, and this tainted the search, under the rationale of Brown v. Illinois and Dunaway v. New York.
The Royer decision came from a sharply divided Court. Four of the dissenting Justices were of the opinion his detention was reasonable, and there was no question but that the consent was voluntary.
In this case the federal agent was not confronted with exigent circumstances such as Mendenhall or Royer. Penick was not deplaning to some distant place, but coming home. He was not a stranger, but a confidential informant of Jacobsen's with whom he had daily contact.
The conclusion is inescapable that in this case the search went beyond Terry v. Ohio and there was no Schneckloth v. Bustamonte setting on the question of consent.
Penick was not informed he had a right to refuse the search, as in Mendenhall.
Although his airline ticket was not detained as in Royer, there can be little question but the degree of "custodial" interrogation" in this case equalled Royer.[6]
Thus, under the holding of Royer, we must hold the Fourth Amendment was violated in the detention of and custodial interrogation of Penick in the police office, thereby tainting the search. See also: Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); U.S. v. Warren, 578 F.2d 1058 (5th Cir.1978); U.S. v. Morin, 665 F.2d 765 (5th Cir.1982).
As we noted initially, this is but one case, judged upon the particular facts presented.
This Court is thoroughly committed to the proposition that an illegal arrest renders a subsequent search inadmissible. See: Pollard v. State, 233 So.2d 792 (Miss. 1970); Terry v. State, 252 Miss. 479, 173 So.2d 889 (1965); Smith v. State, 228 Miss. 476, 87 So.2d 917 (1956); Lewis, et al v. State, 198 Miss. 767, 23 So.2d 401 (1945); Hinton, et al v. Sims, et al, 171 Miss. 741, 158 So. 141 (1934); Castillow v. State, 160 Miss. 473, 135 So. 205 (1931); Myers v. State, 158 Miss. 554, 130 So. 741 (1930).
We, therefore, reverse and remand for proceedings in the Circuit Court consistent with this opinion.
REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
PATTERSON, C.J., BROOM, P.J., and ROY NOBLE LEE, BOWLING, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
WALKER, P.J., dissents.
NOTES
[1] Penick did not have his airline ticket when questioned or searched. Had his airline ticket been in another person's name, it would have been a suspicious circumstance.
[2] Criteria of a "drug courier profile" noted: Mendenhall was coming from Los Angeles, a place of origin for drugs, she was the last person to leave the plane, was nervous, looked around whole area, she went past luggage area without getting any luggage, and changed airlines for her flight out of Detroit.
[3] Had Penick been told he had a right to refuse the search, as Mendenhall was told, this would clearly have removed any question of consent under § 23, as interpreted in Smith v. State, supra.
[4] The profile: carrying heavy luggage, young (between 25 and 35), casually dressed, pale and nervous, looking around for other people, paid for ticket in cash with large roll of bills, did not complete airlines identification ticket showing address and telephone number.
[5] The opinions in Royer v. State, 389 So.2d 1007 (Fla.App. 1980) are most illuminating. Royer was carrying 65 pounds of marijuana in his luggage.

The trial court overruled the motion to suppress on the ground Royer had freely and voluntarily consented to the search. Upon appeal the panel over the District Court of Appeal of Florida (with one dissent) affirmed. Upon motion for re-hearing, the full court sustained the motion and reversed. The majority held Royer had in effect been seized when taken into custody, and any consent he gave for the search was tainted by his illegal detention and rendered the search involuntary. The specific question of whether a consent based upon knowledge of right to decline was never addressed.
Justice Barkdull, however, in specially concurring, was of the view that the search was invalid because the officers did not inform Royer he could decline the search, as well as their retaining his airline ticket.
[6] Indeed, it flies in the face of common experience that a person accosted in an airport as Penick was, and asked to accompany the officers to a private room and told to wait, would think he could say "bye-bye" and that would end the matter. We believe, however, the holding of Brown v. Illinois and Dunaway v. New York are over-extended in application to airport encounters. We can see nothing unreasonable in a short detention, and if the suspect is then told he has the right to decline a search, or if the state shows he knew he could refuse the search, the fruits of the search should be admitted into evidence. In deference, we believe this makes a much clearer reason for permitting or rejecting the evidence than extending the rationale of Brown and Dunaway to these situations.