# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1999-CA-00705-COA

| | |
|---|---|
| STATE OF MISSISSIPPI | APPELLANT |
| v. | |
| TIMOTHY MCGRONE A/K/A THOMAS MCCALLAHAN | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 04/06/1999 |
| TRIAL JUDGE: | HON. JAMES E. GRAVES JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | EDWARD J. PETERS |
| | REBECCA W. WOOTEN |
| ATTORNEYS FOR APPELLEE: | THOMAS M. FORTNER |
| | ROBERT M. RYAN |
| | BRENDA GALE JACKSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | 04/06/1999: MOTION TO DISMISS COUNT 4 OF INDICTMENT NUMBER 98-2-370 JEG IS GRANTED. |
| DISPOSITION: | AFFIRMED - 05/30/00 |
| MOTION FOR REHEARING FILED: | 6/23/2000; denied 1/16/2001 |
| CERTIORARI FILED: | 1/29/2001; granted 4/12/2001 |
| MANDATE ISSUED: | |

EN BANC

IRVING, J., FOR THE COURT:

¶1. McGrone was charged as a habitual offender in a four-count indictment with auto theft, two counts of aggravated assault on a law enforcement officer and simple assault on a law enforcement officer. At the time of the commission of the crimes charged against McGrone, one of the law enforcement officers, attempting to apprehend McGrone, wounded him in the leg. McGrone filed a pre-trial motion to compel production of the pants he was wearing at the time he was shot. The State was not able to produce the pants, and as a result, the circuit court dismissed count four of the indictment. Count four charged McGrone with simple assault on a law enforcement officer. The charge was based on the struggle McGrone was alleged to have engaged in with the police officer that shot him.

¶2. According to the State, the simple assault occurred when McGrone grabbed the officer's arm while the officer, with his police-issued weapon drawn, was ordering McGrone to halt. Fearing that McGrone would obtain the officer's weapon, the officer fired once at McGrone, striking him in the leg. McGrone denied having struggled with the officer and claimed to have been fleeing at the time he was shot.

¶3. On March 29, 1999, a hearing was had on McGrone's motion to compel production of the pants and on a motion to dismiss. McGrone presented three witnesses at the hearing. The hearing was continued at the request of the State until April 5, 1999. Count four of the indictment was dismissed at the conclusion of the April 5th hearing. Aggrieved, the State, pursuant to Miss. Code Ann. § 99-35-103 (Rev. 1995), has appealed that ruling. The following assignments of error are taken verbatim from the State's brief:

**ISSUE NO. 1: WHETHER THE CIRCUIT COURT ERRED IN GRANTING THE DEFENDANT'S MOTION TO DISMISS COUNT FOUR OF THE INDICTMENT WITHOUT A FINDING THAT THE DEFENDANT'S DUE PROCESS RIGHTS HAD BEEN VIOLATED?**

**ISSUE NO. 2 WHETHER THE CIRCUIT COURT FAILED TO MAKE A CORRECT FINDING OF FACT THAT THE LOST CLOTHING WOULD BE EXPECTED TO PLAY A SIGNIFICANT ROLE AS DEFINED BY *CALIFORNIA V. TROMBETTA,* 467 U.S. 479, 104 S.Ct 2528 (1984)?**

**ISSUE NO. 3 WHETHER THE CIRCUIT COURT FAILED TO MAKE A FINDING OF FACT THAT THE DEFENDANT COULD NOT OBTAIN COMPARABLE EVIDENCE BY OTHER REASONABLE MEANS AS REQUIRED BY *TROMBETTA?***

**ISSUE NO. 4 WHETHER THE CIRCUIT COURT FAILED TO MAKE A FINDING OF BAD FAITH ON THE PART OF THE POLICE DEPARTMENT?**

Facts

¶4. A truck belonging to Milton Dixon was stolen from his job site at Galloway Elementary School in Jackson. Shortly after the broadcast of the description of the stolen truck over police radio, an officer with the Jackson Police Department made visual contact with the truck and its occupants. McGrone was driving the truck and sped away from the police officer at a high rate of speed. A transmission went out over the police radio that McGrone would not heed police efforts to stop the truck and was attempting to elude the police.

¶5. Patrolman Robert Bufkin heard this call and set up a road block with his patrol car in an attempt to stop the speeding truck. Deborah Goldman was riding with Bufkin at the time as part of her dispatcher training. Bufkin exited the patrol car, but Goldman remained seated inside the car. McGrone drove the speeding truck at Bufkin in an attempt to run over him, forcing Bufkin to dive out of its path. This action by McGrone gave rise to the charge of aggravated assault on a law enforcement officer. McGrone then drove the truck into the side of the patrol car where Goldman was seated. This action gave rise to the second charge of aggravated assault. McGrone lost control of the truck causing it to crash into the side of a house. McGrone then fled on foot. Patrolman Jonathan Crawford came upon the scene and ordered McGrone to halt. According to the State, as Crawford attempted to draw his service revolver McGrone lunged at Crawford and grabbed his arm. This action by McGrone gave rise to the simple assault charge. Fearing that McGrone would obtain Crawford's weapon, Crawford shot McGrone once in the leg. McGrone claims to have been fleeing at the time he was shot by Crawford and that a gunshot residue test of his pants would have revealed that he was not in close proximity to Crawford at the time he was shot.

¶6. When McGrone was transported to the hospital for treatment of his gunshot wound, his pants were cut

off of his body and bagged as evidence for the Jackson Police Department (JPD). At the hearing on the motion which is the subject of this appeal, Mike Boyanton, a nurse at the hospital where McGrone was treated, testified that hospital records indicated the JPD took possession of McGrone's clothing and any possible valuables. The State was unable to produce the clothing and contended that if the pants were recovered by some unknown JPD officer, they were never logged into evidence and should now be classified as lost evidence.

## Analysis of Issues Presented

### 1. Dismissal without finding a violation of due process

¶7. The State contends that it was error for the trial court to grant McGrone's motion to dismiss count four of the indictment without making a finding that McGrone's due process rights had been violated. The State further argues that the lower court's action in this regard was in contravention of the holding in *California v. Trombetta*, 467 U.S. 479 (1984), the landmark case on preservation of evidence, the rationale of which was adopted by the Mississippi Supreme Court in *Tolbert v. State*, 511 So. 2d 1368, 1373 (Miss. 1987). The State also argues that, under the holding in *Trombetta*, the State's duty to preserve evidence is limited to evidence that might be expected to play a significant role in the suspect's defense and that *Trombetta* defines "significant role" to mean that the exculpatory nature and value of the evidence must have been apparent before the evidence was destroyed and of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means.

¶8. The State claims that in the case at bar, there is nothing in the record to indicate any knowledge whatsoever by the police of the role that the pants might have played in McGrone's defense. Citing *Arizona v. Youngblood*, 488 U.S. 51 (1988), the State goes on to argue that it was McGrone's burden to show that the exculpatory value of his pants was known to the police and that the police acted in bad faith when they lost the pants. The State continues its argument that due process does not impose on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. The State concludes that McGrone failed to show either that the police knew or should have known that the pants McGrone was wearing at the time he was shot could have exculpated him or that there was no other comparable evidence available to McGrone. The State contends that the evidence could have shown an absence of gun powder residue or it could have shown a distinct pattern of gun powder residue, and on the basis of *Trombetta,* when the State fails to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant, no due process violation occurs.

¶9. McGrone agrees with the State's position that the State's duty to preserve evidence is limited to evidence that might be expected to play a significant role in a suspect's defense and that a "significant role," according to *Trombetta*, means the exculpatory nature and value of the evidence must have been apparent before the evidence was destroyed and of such a nature that the defendant cannot obtain comparable evidence by other reasonable means. McGrone, however, urges us to consider Justice O'Conner's concurring opinion in *Trombetta* and its holding that rules concerning preservation of evidence are generally matters of state, not federal constitutional law. McGrone points out that the Mississippi Supreme Court, in keeping with Justice O'Conner's concurring opinion, addressed this issue in *Penick v. State*, 440 So. 2d 547, 551 (Miss. 1983) and held as follows:

> We accord to the U.S. Supreme Court the utmost respect in its interpretation of the U.S.

Constitution. We must, however, reserve for this Court the sole and absolute right to make the final interpretation of our state Constitution and, while of great persuasion, we will not concede that simply because the U.S. Supreme Court may interpret a U.S. Constitutional provision that we must give the same interpretation to essentially the same words in a provision of our state Constitution. This is especially true of a decision from that Court in which the proponents for opposing points of view each give clear and cogent argument in support of their respective positions. Indeed, so lucid, that Court is so sharply divided that a change in a single member's point of view would change the result in the case.

¶10. McGrone contends that the State's argument is essentially that since the U. S. Supreme Court has delivered its interpretation of the federal due process clause in *Trombetta* and its progeny, Mississippi is mandated to apply the same interpretation to Mississippi's corresponding constitutional provision. Not so, says McGrone, because subsequently to *Penick*, and while giving deference to the holdings in the *Trombetta* line of cases, the Mississippi Supreme Court reversed a conviction in *Banks v. State*, 725 So. 2d 711 (Miss. 1997), for a due process violation involving the identical issues raised in the case at bar. The facts in *Banks* are as follows:

¶11. Calvin Banks was found guilty of capital murder in the course of a robbery of Amy Ware in Clay County, Mississippi. After the jury was unable to agree on a sentence, he was given life imprisonment. The circumstantial evidence adduced at his trial tended to show that Banks had been gambling in a card game with some friends not far from the home of the victim for most of the afternoon of August 14, 1993, the day she was murdered. After complaining of having run out of money, Banks left the card game around 4:00 to "go get some more money." He returned to the game with a paper bag in his hand and resumed playing cards. *Banks,* 725 So. 2d at 713.

¶12. Banks had been acquainted with the victim previously; she used to make lunch for him and had agreed to keep a few of his belongings while he was homeless and trying to find a place to stay. The only evidence that could conceivably tie Banks to the crime was the testimony of a witness who saw him step off the victim's porch around the time she is assumed to have died and part of a bologna sandwich found at the crime scene the day after the murder. The State's expert witness testified that although Banks's teeth correlated with the bite marks in the remaining portion of the sandwich he could not say with any degree of certainty that Banks had bitten the sandwich. The autopsy of the victim revealed that she had eaten bologna shortly before she was killed. Although fingerprints not belonging to the victim were found at the crime scene, none matched Banks's. Likewise, although hairs that appeared not to belong to the victim were found at the crime scene, none of the hair came from Banks.

¶13. The defense case consisted of the testimony of one of the victim's neighbors who said that she passed by the deceased's home some time after Banks was known to have returned to his card game. She saw that the wooden door to the victim's home was open. When the victim was found, her door was shut and locked. Banks also put on his own dental expert who testified that he could not draw any conclusions from the photos made of the bites in the bologna sandwich. The expert also testified that he could not exclude the victim from the spectrum of people who could have made the bites in the sandwich, nor could he conclude who had made the bites as between the victim and Banks.

¶14. On appeal Banks argued that the trial court erred in admitting evidence about the bologna sandwich that was found at the scene. Banks moved to suppress the evidence at trial because the State's expert

destroyed the sandwich before Banks or any of his experts could examine it. The State's expert took several photographs of the sandwich and made blow-ups of the photographs which he later gave to Banks to examine, but the expert threw away the actual sandwich. The State argued at the hearing on the suppression motion that the sandwich was thrown away because it was perishable. In response to Banks's suggestion that the State could have simply frozen the sandwich, the State noted that its expert determined that freezing would destroy the sandwich as well, since some test bologna had dehydrated and shriveled when he froze it. The State did not address the fact that the sandwich had been frozen before it was given to its expert for analysis in the first place.

¶15. The trial court denied the motion to suppress the sandwich, finding that the State had not destroyed the sandwich in an intentional attempt to deprive Banks of an opportunity to see it. The court was further satisfied that Banks would be allowed to cross-examine the State's expert and that Banks had found an expert who would be able to refute and rebut the State's evidence, notwithstanding the fact that Banks's expert was unable to examine the sandwich.

¶16. Banks argued further on appeal that, since he was not allowed to examine the sandwich, the evidence should not have been allowed because it was more prejudicial than probative, in violation of M.R.E. 403, and that its admission violated his rights under the confrontation clause. Banks's expert testified at trial that he would have preferred to have seen the sandwich in three dimensions and examined the thickness, etc. He opined that he then could have made a more thorough expert assessment. As such, Banks argued that his expert necessarily seemed less credible to the jury than the State's expert who opined from the vantage of having seen the sandwich in three dimensions.

¶17. As to the first prong of *Trombetta*, the Mississippi Supreme Court found that the sandwich played a constitutionally significant role in Banks's defense. Finding that there had been no showing of any intentional effort on the part of the State to deprive Banks of a view of the sandwich, the Court, nevertheless, found that the bologna sandwich was obviously significant to the defense, and held as follows:

> The State's expert, Dr. Michael West, could not conclude with any degree of certainty at the close of his expert analysis that Banks had bitten the sandwich.

> Contrary to the State's suggestion that the exculpatory nature of this evidence was not apparent before its destruction, Dr. West's failure to make a conclusive determination about the bites in the sandwich was exculpatory and obviously was apparent to him when he destroyed the sandwich.

> Moreover, the testimony about the bite marks in the sandwich was central to the State's and defendant's case, as it is the only evidence that purportedly placed Banks in the victim's house near the time of her death. . . . In this evidentiary context, the credibility advantage that was enjoyed by the State's expert, since his results were based on an actual inspection of the sandwich, takes on substantially greater significance. Cf. *Tolbert*, 511 So. 2d at 1373 (finding no due process violation where State destroyed particle of skin which could not have sustained defense theory of the case in context of all the evidence); cf. also *Johnston*, 618 So. 2d at 92-93 (finding no due process violation where State lost physical evidence that was not germane to State's case and did not corroborate or otherwise prove defense theory of alibi). Unlike the circumstances in *Tolbert* and *Johnston*, the prejudicial impact of the State's destruction of the sandwich on the persuasive value of Banks' case is plainly apparent, and Dr. West's destruction of the sandwich was unnecessary and inexcusable.

*Banks*, 725 So. 2d at 715-16.

¶18. The Court found that the second prong of *Trombetta* required Banks to show that the evidence was of such nature that comparable evidence could not be obtained by other reasonable means. *Id.* at 716. Banks was given access to all the models and photographs made by the State's witness. The Court found that his analysis could perhaps have been considered "comparable" inasmuch as he used the same photos and things that the State's expert utilized in his analysis and testimony. *Id.* However, the Court found that, on the other hand, the weight of the analysis done by Banks's expert was distinctly disadvantaged by the failure of his testimony to arise out of an actual inspection. *Id.* The supreme court found that even though the trial court rested its decision to admit the State's evidence about the sandwich in part upon Banks's opportunity to have an expert testify to the contrary, Banks was denied the opportunity to contradict the weight of the opinion given by the State's expert. *Id.* The State's expert was afforded added credibility due to his having viewed the sandwich and having created the very evidence that Banks was forced to rely upon. *Id.* Consequently, the *Banks* court concluded that the admission of the evidence about the bologna sandwich rendered the trial fundamentally unfair, and the conviction was reversed on that ground. *Id.*

¶19. In the case at bar, the trial court found that in applying the standard set forth in *Trombetta* and based upon the testimony of the hospital nurse who bagged and delivered the clothing to an officer with the Jackson Police Department, the clothing existed and was given to the JPD. It specifically made no finding as to whether the evidence was lost or destroyed, but found that, according to the JPD, the evidence was now unavailable. The court further found that the clothing could have been of exculpatory value based on the testimony of experts for McGrone and for the State. Even though the State's expert offered his opinion that it would be possible to make some determinations or estimates regarding distances without the benefit of having the clothing, he agreed with McGrone's expert that gunpowder residue on clothing worn by shooting victims can be significant in determining distances relative to how far the victim was away from the firearm at the time of the weapon's discharge.

¶20. The lower court further found that the second prong of *Trombetta* was satisfied in that no other comparable evidence was reasonably available to McGrone and that at the time the JPD had possession of the clothing evidence it knew, or should have known, that the clothing could be significant in making determinations relative to the facts and circumstances surrounding the charges against McGrone.

¶21. In light of these findings, the State's claim that the lower court dismissed count four of the indictment without making a finding that McGrone's due process rights were violated is without merit. McGrone's defense against the simple assault on a police officer charge was that he was running away from the officer, not struggling with the officer at the time he was shot. He wanted the pants tested for gunshot residue which would have been present on the pants if he was in a close struggle with the officer at the time he was shot. The prejudicial impact of the State's failure to preserve the pants is plainly apparent on the persuasive value of McGrone's case, and the loss of the pants was unnecessary and inexcusable. *Banks*, 725 So. 2d at 716. This issue is without merit.

### 2. Lower court finding that pants would have played a "significant role" as defined by *Trombetta*

¶22. The State argues that the lower court did not have enough evidence before it at the hearing on McGrone's motion to dismiss to determine whether the exculpatory value of the pants was apparent to the JPD officer who recovered the pants from the hospital. The State bases this argument on the fact that there

was nothing in the record to indicate the identity of the person who received the pants; therefore, the State argues, it is impossible to say that the person who received the pants knew that the pants could have exculpatory value for McGrone. The State contends that Mississippi case law requires that the person destroying or losing the evidence must have known the apparent exculpatory value of the piece of evidence prior to destruction or loss of said evidence. The State cites *Taylor v. State*, 672 So. 2d 1246 (Miss. 1996) in support of its argument. We find that *Taylor* and the case at bar are clearly distinguishable.

¶23. Taylor contended that the State improperly failed to preserve the victim's car and the x-rays taken prior to the victim's autopsy. He argued that those pieces of evidence could have been exculpatory in nature as well as vital in shedding more light into the victim's cause of death. The Mississippi Supreme Court found that, in accordance with usual police procedure, the car remained in police custody for approximately a month and a half before it was released to the victim's family. There were photographs of the car which showed the location and condition of the vehicle. The Court further found that in viewing the photographs, no exculpatory evidence appeared to be present. The Court found that the x-rays, on the other hand, were taken prior to the autopsy in order to search for foreign objects as well as broken bones. When the x-rays did not reveal either foreign objects or broken bones, they were thrown away.

¶24. The court, citing *Tolbert*, 511 So. 2d at 1372, held that the mere possibility that evidence might aid the defense does not satisfy the constitutional materiality standard, and that, citing *Washington v. State*, 478 So. 2d 1028, 1032 (Miss. 1985), if the destruction of evidence was done as a matter of routine and with no fraudulent intent, there is no inference of bad faith. Finally, the court held that the mere possibility that the car or the x- rays would show some exculpatory evidence is not enough to meet the *Trombetta* standard.

¶25. We find that, in the case at bar, there is much more than the mere possibility that the pants would show exculpatory evidence. The expert testimony at the hearing on this matter was undisputed and without doubt that the presence or absence of gunpowder residue on the clothing worn by a shooting victim is highly significant on the issue of the distance between the victim and the shooter. Also, as suggested by McGrone in his appeal brief, the fact that no one was produced who could testify as to what happened to McGrone's clothing is immaterial to the analysis. What is material to the analysis is the fact that it is standard operating procedure for the JPD to seize and log into evidence clothing worn by a shooting victim. Such is prima facia evidence in itself that the clothing could be expected to play a significant role in the prosecution of the case, especially when the case is one involving a police shooting.

¶26. We agree with the lower court's ruling that the exculpatory value of the pants was apparent or should have been apparent to the JPD, and to allow the State to proceed on the charge of simple assault on a police officer in light of the loss of the evidentiary value of the pants would be fundamentally unfair. This issue is without merit.

### 3. Comparable evidence by other reasonable means as required by Trombetta

¶27. The State alleges that the lower court failed to make a finding of fact that McGrone could not obtain comparable evidence by other means and that without a finding one way or the other, McGrone failed to satisfy the second prong of *Trombetta*.

¶28. The lower court, in its opinion from the bench, ruled as follows:

But the second prong of that particular test is that the Court has to find the defendant would be unable

to obtain comparable evidence by other reasonably available means. And that takes the Court to the testimony of Steven Hayne who alleges that he may be able to make some calculations and offer some opinions about distances even without the clothing worn by the defendant at the time of the incident in Count 4 of this indictment.

However, when the Court considers that the evidence is unavailable, the evidence was, in fact, given to the Jackson Police Department; that not a single police officer showed up in response to subpoenas served on them by the defendant; that the hearing was, in fact, continued until today, still no police officers; that expert Hathcock offered an opinion that the clothing could be significant in making a determination about the distances . . . .

The State contends that this passage of the record indicates that the court began to address the issue but never made a finding one way or the other, and that without a finding one way or the other, the defense failed to satisfy the second *Trombetta* prong. This Court agrees that the trial court did not follow through in specifically addressing this issue with the same degree of clarity as it did when it addressed the first prong of *Trombetta*. However, we disagree with the State's conclusion that that fact constitutes reversible error. We believe that when the trial judge, while considering the second prong of *Trombetta,* made the statement: "when the court considers that the evidence is unavailable," the trial judge was actually weighing the value of the evidence available in light of Dr. Haynes's testimony and concluded that even so, such evidence, as the evidence in *Banks,* left McGrone at a substantial disadvantage since it would not be comparable evidence. We agree with the ultimate assessment by the lower court and find that this issue is without merit.

### 4. Lower court's failure to make a finding of bad faith on the part of the police department

¶29. The State argues that the lower court failed to make a finding of fact that the police acted in bad faith when they apparently lost McGrone's pants, and that without such a finding, it was error for the court to dismiss count four of the indictment. The judge in the lower court stated the following in its ruling on the motion to dismiss:

In the instant case, we first find, based on the testimony of Boyanton that the clothing evidence existed. And we further find that the evidence was given to the Jackson Police Department. *As to whether or not the evidence was lost or destroyed, the Court makes no finding in that connection. . . . and, again, the Court is making a finding that it was, in fact, received, but making no finding about what happened to it after they received it* - but based on the testimony of Witness Boyanton, the Court makes a finding that the Jackson Police Department, in fact, received that clothing evidence. (emphasis added).

¶30. It is clearly evident from the foregoing passage that the lower court was emphatic that it was not making any finding concerning what happened to the clothing after it was received by JPD, which included no finding of either good or bad faith. The State would have this Court find error on the part of the lower court for ruling as it did without finding bad faith on the part of the JPD, and directs this Court's attention to a number of case authorities wherein it was held that the *Trombetta* standard was not met because of the lack of bad faith on the part of the State.

¶31. The fallacy in the State's argument is that in each of the cited authorities the question of bad faith was an issue primarily due to the intentional destruction of the evidence, and in one case, the evidence was lost but was not germane to the State's case and did not corroborate or otherwise prove the defense theory. In

the case at bar, there is no issue of intentional destruction which would give rise to the question of motive on the part of JPD, and the lost evidence in question is certainly germane to the State's case and could corroborate or otherwise prove the defense theory, so the cited authorities do not support the State's contention. In fact, this Court knows of no case authority or rationale that would deprive the lower court of its authority to find that the *Trombetta* standard of materiality is met because of the absence of bad faith. This issue is without merit.

¶32. **THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY DISMISSING COUNT FOUR OF THE INDICTMENT CHARGING SIMPLE ASSAULT ON A POLICE OFFICER IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE HINDS COUNTY.**

**McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., AND THOMAS, J., CONCUR. LEE, J. DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BRIDGES, MOORE, AND PAYNE, JJ.**

LEE, J., DISSENTING:

¶33. Although I have great deference for the opinion of the majority, I must dissent. I am of the opinion that the criteria necessary to dismiss count four in the indictment has not been met. The majority has cited *Banks v. State*, 725 So. 2d 711 (Miss. 1997), in their discussion of the issues presented by the State; however, when I read *Banks*, I find the case to be factually distinguishable from the case *sub judice*.

¶34. In *Banks* it was clear that the evidence (i.e., the bologna sandwich) would be exculpatory because it was the very piece of physical evidence the State was using in an attempt to prove that Banks was the perpetrator of the crime. *Banks*, 725 So. 2d at 714. Additionally, the State had the benefit of examining the actual sandwich. However, Banks was denied this privilege and was only provided with pictures of the sandwich for his expert's analysis. *Id*. Furthermore, it appears that the State intentionally and in bad faith destroyed the evidence before an expert for Banks had analyzed the bite mark in the sandwich. *Id*.

¶35. The State argued that the evidence had to be disposed of due to the sandwich's perishable nature. *Banks*, 725 So. 2d at 714. When Banks had inquired about the option of having frozen the sandwich for later review the State said this would alter the evidence. *Id*. Nevertheless, it was later revealed that the sandwich had been frozen before the State examined it in an attempt to match the teeth marks to those of Banks. *Id*.

¶36. When this Court determines whether the evidence "play[s] a significant role in the defendant's case" we must determine the following: (1) the police have to possess knowledge of the exculpatory nature of the evidence before the evidence becomes unavailable, and (2) that the evidence is of such a nature that the defendant can not obtain comparable evidence by reasonable means. *Tolbert v. State*, 511 So. 2d 1368, 1372 (Miss. 1987). It is not the Jackson Police Department's job to anticipate and create a defense. The facts in this case negate the assertion that the police department knew that the evidence would play a significant role in McGrone's case and acted in bad faith to suppress the evidence.

¶37. McGrone, an habitual offender, was involved in a crime spree on the day he was charged with simple assault of the officer. As a result of having been struck by a bullet from the officer's firearm he was taken to the hospital. Upon his arrival at the hospital, in an effort to deceive, McGrone used the alias name of

Thomas McCallahan. He created this deception to conceal his identification and his connection to any previous or current crimes he may have committed, thus assisting in creating the problem of the lost pants. The incorrect name information given by McGrone increased the chances of the pants being improperly logged or misplaced by the hospital staff or police officers. Additionally, it is unclear whether the officers actually received the evidence, inasmuch as the nurse who had assisted in the care and treatment of McGrone testified that he had charted that the pants and other valuables were delivered to the Jackson Police Department; therefore, the event must have occurred. Notwithstanding, but for the note in the chart, the nurse could not remember any of the facts of the particular instance, nor did the notes reflect who from the Jackson Police Department received the pants, nor were there any signatures or initials indicating the receipt thereof. Subsequent testimony from Tara Ervin, booking process employee for the Hinds County Detention Center, revealed that when McGrone, a.k.a. McCallahan, was delivered from the hospital to booking, she only logged in two hospital gowns and a bag of medical contents. Additionally, it was stipulated that the evidence list for the month of February (i.e., the month McGrone was arrested) did not list the clothing that McGrone was wearing at the time of the shooting. McGrone has failed to meet the burden in proving that his pants were a foreseeable necessity as evidence for his case.

¶38. Just because McGrone, a career habitual offender, says that he was fleeing instead of struggling with the officer at the time he was shot and that gun powder residue on the pants *may* have proven this, do we have to believe it? Simply because there is a possibility that the evidence might assist the defense does not fulfill the constitutional materiality standard. *Tolbert*, 511 So. 2d at 1372. The fact that McGrone is basing his argument on a possibility was further supported by the testimony of Starks Hathcock and Steven T. Hayne.

¶39. Hathcock, a forensic scientist, testified that in a case such as this, one would not always expect to find gun powder residue. Hathcock further testified that the gun powder residue could be destroyed by the subject's blood or the subject's rolling around on the ground; also the material which the pants were made of could affect the presence or absence of gun powder; and the packaging of the material at the hospital would be critical. Hayne, a pathologist, confirmed that evidence could absolutely be destroyed if it were improperly handled and evidence such as the pants should be allowed to dry and placed in a paper bag. This is contrary to the handling of the evidence by the hospital. The nurse testified that the pants were placed in a plastic bag. This would increase the possibility of the destruction of any gun powder residue. It is also apparent that McGrone had comparable evidence available to support his argument that he was shot at long range.

¶40. On cross-examination, Hathcock was asked if the clothes were not present, could a pathologist look at a wound and determine the distance of a gunshot. Hathcock's reply was in the affirmative. Hayne testified and supported the assertion of Hathcock.

¶41. Hayne stated that although having the clothing is of value, even if one did not have the clothing "[i]t would be possible to come to a conclusion as to a range that the weapon was fired in distance from striking the individual. I could not tell you, certainly, with any high degree of probability that that could be done, but it certainly made a distinct possibility." Dr. Hayne stated he could determine this information by reviewing various items, including: x-rays, hospital records, records from the police department, and the defendant's version of the events.

¶42. The burden placed on the prosecution of proving its case is difficult at best. It should not be made

insurmountable. I for one deem McGrone a success in his efforts of crime and deception and would accordingly reward him for his efforts by serving him with count four of the indictment.

**BRIDGES, MOORE, AND PAYNE, JJ., JOIN THIS SEPARATE OPINION.**